JOHN ROTH & Co. *v.* COLVIN, ALLEN & Co.

*Partnership. Promissory notes. Jury.*

If the several members of a partnership have power to bind the firm by the execution of promissory notes in the firm name in matters pertaining to the partnership business, the firm will be liable to the *bona fide* purchaser of a note in their name, though executed by one partner, even though it be without consideration; or upon a consideration not inuring to the partnership use.

The questions, whether the holder of current negotiable paper has taken it with or without notice of defences between prior parties, whether he has exercised good faith in the transaction, or has been guilty of negligence or a want of proper care, are always questions of fact to be determined by a jury.

Roth & Co. *v.* Colvin, Allen & Co.

The defendant, residing at Burlington, was a member of a firm of wharfingers, the other members of which resided and did the firm business at Port Kent, N. Y., the defendant having no active participation in the management of the business. One of the firm, without the defendants' knowledge, executed in the partnership name three notes, one for five hundred dollars, and two for one thousand dollars each, without consideration, all dated in the same month, and payable to C., or order, who, before their maturity, negotiated them for a valuable consideration to the plaintiffs, to whom he was largely indebted, and who knew that he was insolvent and that the defendant did not reside at the place of the business of the firm, where the notes were dated. The plaintiffs had no knowledge of any custom or necessity of the defendants' firm to execute notes, and took the notes in question relying on the responsibility of the defendant, and supposing them to be business notes, but they made no inquiry as to his knowledge of their execution, or whether they were in fact business or accommodation paper.

The plaintiffs having sued the defendant on the notes, the case was referred, and the referee, after reporting the foregoing facts, stated that he was of opinion from said facts that the plaintiffs ought, in good faith towards the defendant, to have inquired, before they took the notes from C., whether the defendant had authorized the making of them, and that they were wanting in due diligence in not inquiring of the defendant, or C., whether they were accommodation notes or not; *Held*, that this statement of this opinion of the referee was to be considered as the decision by him of questions of fact, and as such was conclusive; that the facts recited by him had a legal tendency to support such a decision; and that the plaintiffs were not entitled to recover.

The purchaser of negotiable paper must exercise reasonable prudence and caution in taking it; and if the circumstances are such as would excite the suspicion of a prudent and careful man in regard to the binding force of the paper as between the original parties, and the purchaser take it without making inquiry, he will not stand in the position of a *bona fide* holder, and cannot recover upon it, though he may have paid value for it.

ASSUMPSIT. The action was prosecuted only against Isaac Nye, one of the defendants, a *non est* return having been made as to the others, Colvin and Allen. The case was referred and the referee made the following report:

"The plaintiffs claim to recover upon three promissory notes, one for one thousand dollars, dated Port Kent, May 1st, 1854, payable four moths after its date ; one for one thousand dollars, dated Port Kent, May 5th, 1854, payable three months from its date; and one for five hundred dollars, dated Port Kent, May 25th, 1854, payable three months from its date, all made payable to the order of Peter Comstock ; the two for one thousand dollars each, at the Albany City Bank, at Albany, New York, and

the one for five hundred dollars, at the Troy City Bank, Troy New York, and all signed Colvin, Allen & Co.

And the plaintiffs further claim a recovery, upon a receipt, or wharfinger's certificate, dated Port Kent, January 6th, 1854, and signed Colvin, Allen & Co., certifying that P. Comstock, for the Franklin Falls Lumber Co., had left in the hands of Colvin, Allen & Co., five thousand new mill white pine boards, to be held subject to the return of said certificate, and to his order thereon,

The referee finds that during the whole of the year 1854, and for some time before and after that year, Alvin Colvin and Charles P. Allen, of Port Kent, New York, and Isaac Nye, of Burlington, in this State, were tenants in common and joint owners of a wharf, with store houses thereon, at Port Kent, and under the firm name of Colvin, Allen & Company carried on copartnership business at Port Kent, which consisted chiefly in receiving, storing and forwarding freight, and collecting and paying freight bills, and making occasionally some small advances upon freight. Said business was conducted and managed by Colvin and Allen for the most part, Nye taking no active part in its management.

The nature and character of their business was such that it became necessary for them occasionally to obtain credit to some small extent. During the year 1854, notes were discounted for Colvin, Allen & Company, at the Essex County Bank, Keeseville, New York, from four to six times, but for what purpose and to what amount the referee is unable to find.

In the winter of 1853 and 1854, and the spring of 1854, Peter Comstock, representing the Franklin Falls Lumber Company, drew and deposited lumber upon the defendants' wharf, and the wharfinger's receipt now in question was given by Allen to Comstock for lumber so deposited.

The notes in question were also made and signed by Allen, at Port Kent, at their respective dates, and were delivered to Comstock by Allen without any value or consideration, but merely for the benefit and accommodation of Comstock in carrying on his own business, which was the manufacture of lumber, and which he carried on under the name of the Franklin Falls Lumber Company.

Comstock, during the spring of 1854, while these notes were

current, negotiated, transferred and indorsed the same to the plaintiffs at Troy, who were doing partnership business there, as merchants and traders, and who discounted them supposing them to be business notes.

In the early part of 1854, Comstock also transferred and indorsed to the plaintiffs the wharfinger's receipt or certificate above described. And the plaintiffs paid him full value for the notes and receipt when they were so negotiated by him.

But the referee finds that the notes and certificate were so made and delivered by Allen to Comstock, and so negotiated by him to the plaintiffs without the knowledge or consent of Nye, and that Nye was never aware that any notes had been discounted at any time for Colvin, Allen & Company at the Essex County Bank, or elsewhere, until long afterwards, or that notes or certificates were used in their business at all, but he knew it was customary in such business to give certificates.

When these notes were discounted by the plaintiffs for Comstock, the plaintiffs supposed them to be business notes, but Comstock was at the same time largely indebted to them and they knew he was insolvent. They did not know that it was customary for Colvin, Allen & Company, or any other wharfingers on Lake Champlain, to use promissory notes in carrying on their business. They knew Colvin and Allen as wharfingers, but did not know their responsibility; but in purchasing the notes they relied almost entirely upon Nye, whom they were informed was a partner with Colvin and Allen, and owned considerable property, and they knew he lived in Burlington, but they made no inquiry as to his knowledge of the making of the notes, or whether they were business or accommodation notes.

It was customary for Colvin, Allen & Company, on the delivery of property upon their wharf for transportation, to give receipts or certificates like the one in question, and at the time Comstock gave the receipt in question to the plaintiffs, the referee finds that Colvin, Allen & Company were holding the lumber described in the receipt, and that the same was then worth eight hundred dollars, the sum advanced by the plaintiffs to Comstock upon the receipt; that the plaintiffs afterwards sent the receipt forward for collection, and it was returned uncollected, but there

was no evidence before the referee that the plaintiffs have ever made any demand upon Colvin, Allen or Nye for said lumber; but it was proved, and the referee finds, that there is not now, nor has there been within three years, any lumber on said wharf to answer to the receipt, or any lumber in the hands of Colvin, Allen & Company belonging to said Franklin Falls Lumber Company.

The plaintiffs brought suits upon these notes in Troy, but obtained no personal service upon Nye, and obtained judgments June 26, 1855, against Colvin, Allen and Nye, but by the laws of New York the judgment against Nye had only the effect to hold all the joint property of the firm of Colvin, Allen & Company in that State.

The referee is of opinion from the facts here found and submitted, that the plaintiffs ought, in good faith towards Nye, to have inquired before taking these notes of Comstock, whether Nye had authorized the making of them, and were wanting in due and reasonable diligence in not making any inquiry of Nye or Comstock whether the same were accommodation notes merely, and if so whether they were authorized by the defendant.

If the court, from the facts reported, should consider that the plaintiffs are entitled to recover the amount of the notes and receipt, the referee finds due the plaintiffs the sum of forty-one hundred and seventy-three dollars and two cents; but if the court should consider that the plaintiffs are entitled to recover upon the notes and not upon the receipt, the referee finds due the plaintiffs thirty-one hundred and forty-nine dollars and two cents; but if upon the receipt and not upon the notes, the referee finds due the plaintiffs the sum of ten hundred and twenty-four dollars."

But should the court consider that the plaintiffs are not entitled to recover, either upon said notes or said receipt, the referee finds that there is nothing due to either party.

The county court, at the September Term, 1858, in Chittenden county,—BENNETT, J., presiding,—rendered judgment, *pro forma,* on the report for the plaintiffs for the largest sum reported by the referee, to which the defendant Nye excepted.

*E. R. Hard* and *J. French*, for the defendant Nye.

10

1. The plaintiffs were not entitled to recover upon the wharf-inger's certificate. 1 Chitty's Plead. 2, 5; *Collins* v. *Lincoln*, 11 Vt. 268; *Jones* v. *Fales*, 4 Mass. 245.

2. Admitting the plaintiffs to be *bona fide* holders of the notes, Nye was not liable upon them, because the nature of their part-nership and the character of their business were not such as to authorize one partner to bind the firm by executing negotiable instruments; Collyer on Part. sec. 402; *Dickinson* v. *Valpy*, 10 B. & C. 128; *Levy* v. *Pyne*, 1 Carr. & Marsh. 436; *Hedley* v. *Bainbridge*, 3 Ad. & E., N. S. 315.

3. The plaintiffs hold the notes subject to all defences that might have been made to them in the hands of Comstock; and as he could not have enforced them against Nye, the plaintiffs cannot.

*a.* The referee having found that Colvin, Allen & Company were mere accommodation signers of the notes for Comstock, and that this was a fraud upon Nye, *it was incumbent upon the plaintiffs to show that they received the notes in the due course of business, for value, and that they were guilty of no want of care in taking them; Sandford* v. *Morton*, 14 Vt. 228.

Therefore, as the referee does not find that the plaintiffs took the paper in the usual course of business, and in the exercise of due caution, the defendant is entitled to judgment.

*b.* Irrespective, however, of any question as to the burden of proof, it is well settled law that if the indorsee of a note takes it in bad faith, or without due caution, and under circumstances which ought to have excited the suspicions of a prudent and careful man, the maker may be let in to his defence. And the referee having found affirmatively that "the plaintiffs ought, in good faith toward Nye, to have inquired before taking said notes of said Comstock, whether said Nye had authorized the making of said notes, and were wanting in due and reasonable diligence in not making any inquiry," etc., the case is rendered conclusive in favor of the defendant; 3 Kent. Com. 93 *et seq.; Gill* v. *Cubit*, 3 B. & C. 466, (10 E. C. L. 154.); *Strange* v. *Wigney*, 6 Bing. 676, (19 E. C. L. 305.); *Brown* v. *Davis*, 3 Term 80; *Grant* v. *Vaughan*, 3 Burr. 1576; *Easley* v. *Crockford*, 10 Bing. 243, (25 E. C. L. 116.); *Eagan* v. *Threlfall*, 5 D. & R. 326, (16 E. C. L.

237.) ; *Town* v. *Hulling*, 4 B. & C. 330, (10 E. C. L. 347.) ; *Snow* v. *Peacock*, 2 C. & P. 215, (12 E. C. L. 535.) ; *Slater* v. *West*, 3 C. & P. 325, (14 E. C. L. 330.) ; *Cunliff* v. *Booth*, 3 Bing. N. C. 82, (32 E. C. L. 339.) ; *Haynes* v. *Foster*, 2 C. & M. 237 ; *Sandford* v. *Norton*, 14 Vt. 228 ; *Ayer* v. *Hutchins*, 4 Mass. 273 ; *Thompson* v. *Hale*, 6 Pick. 259 ; *Cone* v. *Baldwin*, 12 *Ib.* 545 ; *Hall* v. *Hale*, 8 Conn. 336 ; *Beltzhoover* v. *Blackstock*, 3 Watts 20 ; *Pringle* v. *Phillips*, 5 Sandf. 157 ; *McKesson* v. *Stanbury*, 23 Ohio 213 ; *Nichols* v. *Patton*, 13 Louis. 213 ; *Wiggin* v. *Bush*, 12 Johns. 205 ; *Fowler* v. *Arantby*, 14 Pet 318 ; 1 Am. L. C. 338 *et seq.*

4. The statement in the report above quoted as to the plaintiffs' want of good faith and due caution, is not the mere legal opinion of the referee, but the distinct finding of a fact by him, and as such is conclusive.

And if the referee had not found such to be the fact, the circumstances detailed in the report are quite sufficient to show it.

5. The judgment against Colvin, Allen & Company rendered in New York, is a bar to any recovery againt Nye in this action ; 1 Chitty's Pl. 47 ; *Robertson* v. *Smith*, 18 Johns. 459 ; *Smith* v. *Black*, 9 S. & R. 142 ; *Perry* v. *Martin*, 4 Johns. Ch. 566 ; *Downey* v. *F. & M. Bank*, 13 S. & R. 288 ; *King* v. *Hoane*, 13 M. & W. 404 ; *Ward* v. *Johnson*, 13 Mass. 148 ; *Clark et al.* v. *Candee et al.*, 2 Mich. (Gibbs) 255.

*Roberts & Chittenden*, for the plaintiffs, cited Chitty on Bills, 217–257 ; *Crook* v. *Jadis*, 5 Barn. & Ad. 909 ; *Backhouse* v. *Harrison*, *Id.* 1098 ; *Foster* v. *Pearson*, 1 Cromp. M. & R. 849 ; *Uther* v. *Rich*, 10 Ad. & El. 784 ; *Goodman* v. *Harvey*, 4 Ad. & El. 870 ; Story on Bills, sec. 195 ; Story on Promissory Notes, sec. 382 ; 2 Greenl. Ev., sec. 639 ; Collyer on Part., Sec. 448 ; *Sanderson* v. *Brooksbank*, 4 Car. & P. 286 ; *Worcester Co. Bank* v. *Dorchester & Milton Bank*, 10 Cush. 488 ; *Brush* v. *Scribner*, 11 Conn. 395 ; Greenleaf's Overruled Cases, 187.

POLAND, J. I. The first ground of defence which the defendant Nye sets up to the three notes is, that the members of the firm of Colvin, Allen & Company had no authority to bind the firm by signing the partnership name to negotiable promissory

notes, even in the legitimate business of the firm, or for money obtained to be used in their business; that no such power was expressly conferred upon the several partners, and that it was not necessary in order to carry on the business of the firm, and therefore could not be inferred or implied. Upon this part of the case the court are not fully agreed, and the point is therefore left undecided. Assuming that the members of that firm had legal authority to bind it by signing the partnership name to negotiable promissory notes, for the real use of the firm and in its business, it is not claimed that they had power to pledge the partnership name for the accommodation of other persons, for that was not within the scope of their business. But if the several partners had power to bind the firm at all by the execution of such instruments in their business, they would be liable to a *bona fide* holder of a note executed by a member of the company in their name, though really without consideration, or upon a consideration not inuring to the partnership use.

II. This brings us to the consideration of the important point involved in the case. Are the plaintiffs, upon the finding and report of the referee, *bona fide holders* of these notes against the defendant Nye?

Much of the difficulty which has arisen in determining this case, has been occasioned by the peculiar character and language of the referee's report, and the different constructions placed upon it by counsel, and different members of the court.

He reports that Comstock transferred the notes to the plaintiffs while they were current, receiving from them a full consideration for them, the plaintiffs supposing them to be business notes, but making no inquiry as to their origin or consideration, or whether they were accommodation notes, or their execution authorized by the defendant Nye.

After detailing all the circumstances in relation to the condition of the various parties, which are relied upon by the defendant as affecting the plaintiffs with notice that the notes were not authorized by or binding upon him, the referee sums up in the following language: "The referee is of opinion from the facts here found and submitted, that the plaintiffs ought, in good faith towards Nye, to have inquired before taking said notes of said Comstock,

whether said Nye had authorized the making of said notes, and were wanting in due and reasonable diligence in not making any inquiry of said Nye or Comstock, whether the same were accommodation notes and authorized by the defendant."

The counsel for the plaintiffs insist that this is not to be understood as a finding or conclusion of *fact* by the referee, but that it is merely the expression of a legal opinion upon the effect of the facts before recited, and that the court are left to apply the law to those facts, without reference to any adjudication by the referee. But the questions, whether the holder of current negotiable paper has taken it with or without notice of defences between prior parties, whether he has exercised good faith in the transaction, or has been guilty of negligence or a want of proper caution, are always questions of fact to be submitted to and determined by the jury. All the circumstances attending the transaction, the condition of the several other parties, and all other facts that bear upon such an issue, are only evidence for the jury to weigh in deciding it.

In this case the referee stood in the place of a jury, and it was his duty to weigh all evidence bearing upon that subject, and draw the proper conclusion of fact therefrom. We are of opinion that such was the purpose of the referee, and when he says "the referee is of opinion," it is to be understood the same as if he had said the referee *finds*, or *decides*, or *adjudges*, etc. Taking the whole report together, what is the fair result of the referee's finding as to the taking of these notes by the plaintiffs from Comstock, and their knowledge or want of knowledge of their true character, and their diligence or negligence in obtaining information on that subject?

He finds they received the notes while current, and paid full value for them, and had no knowledge in fact that they were executed by Allen in fraud of, or without authority from the defendant Nye, but that at the same time, from their knowledge of the condition of Comstock and his business with them, and their knowledge of the business of Colvin, Allen & Company, and the nature of the defendant Nye's connection with them, and the circumstances of this transaction itself, they must, as men of ordinary prudence and sagacity, have suspected that these notes

were not ordinary business notes of Colvin, Allen & Company, but were given merely for the accommodation of Comstock, and without the assent of Nye, and that having reason to suspect this they made no inquiry upon the subject. The plaintiffs claim that if the referee's finding is to be treated as one of fact, the evidence reported has no legal tendency to support his finding, or in other words, that none of the circumstances detailed by him were of such a nature or character as justly to raise any suspicion in the plaintiffs that the notes were not proper business notes of Colvin, Allen & Company. It is always more difficult to determine from a mere written narration of such facts what proper tendency they have, and what inferences should be legitimately drawn from them, than it is when the parties and witnesses are before the trier, and the whole transaction and all its surroundings are seen. But as the facts are detailed in the report, we think they do legally tend to support the finding of the referee. The fact of Comstock's insolvency, and his indebtedness to the plaintiffs, might afford a very considerable amount of evidence as to the probability that he would have notes of Colvin, Allen & Company to so large an amount, arising solely from business transactions between them, but there is hardly enough stated in reference to those matters to enable us to say how strong an interence could be drawn from that. The referee had far better opportunity to judge correctly.

The large amount of these notes, the fact that they were executed so nearly at the same time, and that they were all for round sums, of five hundred, and one thousand dollars, had a tendency to excite suspicion that they did not arise out of ordinary business dealings. This, taken in connection with the knowledge of the plaintiffs that the business of the firm was done by Allen and Colvin at Port Kent, and that Nye lived at Burlington and had no participation in the management of the business, had a tendency to excite doubt and suspicion whether these notes were executed with his knowledge and approbation.

Without taking further time to comment upon these facts, it is sufficient to say that the evidence reported, in our judgment, legally tended to support the finding of the referee, and if so we cannot disturb it, as the same has the conclusive effect of a verdict.

This brings us to the consideration of the legal question which has formed the principal topic of discussion in the case. What notice of a defence to a note or bill between the original parties is necessary in order to deprive a holder for value of the legal character of a *bona fide holder?* Is actual knowledge of the fact necessary; or must he have so much knowledge on the subject as to make it absolute bad faith or fraud on his part to become a purchaser; or is it enough that there are such circumstances of suspicion attending the matter as would induce a man of ordinary sagacity and prudence to suspect some infirmity in the holder's title, or the validity of the instrument itself?

It is not claimed by the plaintiffs' counsel that absolute or positive knowledge is necessary to be proved, but they insist that notice of such facts must be proved as to make it a case of fraud or bad faith in him to become the purchaser; while the defendant's counsel claim that notice of such facts as create any fair ground of suspicion on that subject, and such as would put a careful and prudent man on inquiry, is all that is neceesary, if the party omits to make reasonable and prudent investigation to learn the truth. Both claim to be supported by authority, and cases are cited which do support each of these rules.

Previous to the case of *Gill* v. *Cubit,* 3 B. & C. 466, (10 E. C. L. 154.) the rule does not appear to have been very definitely settled in the English courts. The language of judges in different cases seems to vibrate between the two; but in that case the rule was distinctly laid down by the court of King's Bench in very strong and clear terms, that the purchaser of negotiable paper must exercise reasonable prudence and caution, and that if the circumstances were such as ought to have excited the suspicion of a prudent and careful man, and he made no inquiry, he did not stand in the legal position of a *bona fide holder.* This case seemed to have established the rule in the English courts, and was fully adopted, and substantially the same rule was laid down in a large number of reported cases, many of which have been cited by the defence. The rule was put forth by all the writers upon mercantile law as the rule governing the transfer of negotiable paper. The same rule was adopted by the courts of this country generally, and seemed to have become a fixed rule

in the law of negotiable paper. But after having been so often followed as to have become apparently permanent, the court of King's Bench, under the lead of Lord DENMAN, abandoned it, and adopted the rule that nothing short of actual bad faith or fraud in the purchaser, would deprive him of the character of a *bona fide* purchaser, and let in defences existing between prior parties: that no circumstances of suspicion merely, or want. of proper caution in the purchaser, will have this effect, and that even gross negligence has no effect, except as evidence tending to establish bad faith or fraud.

This was decided in the case of *Goodman* v. *Harvey*, 4 A. & E. 870, (31 E. C. L. 212,) and in several other cases in England, and may now probably be regarded as the settled rule in the English courts. Since these latter decisions have been made, Judge STORY, Professor GREENLEAF and other writers have quoted them as changing the rule of law on the subject. As before stated, the rule laid down in *Gill* v. *Cubit* was generally adopted by the American courts and seemed to have become the settled law of this country, until the later decisions in England, and the promulgation of them by Judge STORY and Professor GREENLEAF in their legal treatises. We have been referred to but one American case which can properly be regarded as an adoption of the later English rule ; that is the case of *Worcester County Bank* v. *Dorchester & Milton Bank*, 10 Cushing 488. That case, however, was an action to recover the amount of a bank bill which had been stolen, and the court strongly intimated that there may be a difference between bank bills which pass in community from hand to hand as money, and ordinary negotiable paper. Still, the court treat the case of *Goodman* v. *Harvey* and the cases following it, as having settled the rule of law according to those decisions. But the subject does not appear to have been very thoroughly examined, and the several cases in Massachusetts which followed the earlier rule are not even alluded to. We have also been referred to a case in the 11th Conn. 338, *Brush* v. *Scribner*, where the court speak of *Gill* v. *Cubit* as having been overruled by subsequent cases in England. But :this question was not before the court. The question in that case was, whether one could be a *bona fide* holder of a bill or note

which he received in payment of an antecedent debt. We have been referred to the case of *Pringle* v. *Philips*, 5 Sandf. 157, decided by the superior court in the city of New York in 1851.

The whole subject is there most ably examined by DUER, J., and all the cases, both English and American, are carefully and ably reviewed. That court upon the fullest consideration, both upon authority and reason, establish the rule as laid down in *Gill* v. *Cubit*. It is but just to say that the decisions of no tribunal in the country upon questions of commercial law are entitled to more consideration than those of the superior court of New York at the date of that decision. The only case in our own reports that we are aware of where this question has been discussed at all, is that of *Sandford* v. *Norton*, 14 Vt. 228. The precise question was not before the court in that case, but came up incidentally. The question appears however to have been examined, and the English cases are cited, and the fact that *Gill* v. *Cubit* had been departed from by the English courts is alluded to, but the court express a decided opinion in favor of the doctrine held in that case.

In our judgment that doctrine is best sustained by authority. But if the question were wholly new, and we were now called upon to establish a rule for the first time, we should feel no hesitation in saying that such should be the rule to govern the purchase and transfer of negotiable securities. / It is the rule which is applied to all other cases of business dealings when the rights of third persons may be thereby affected, both in relation to real and personal property. In the case of sales of personal property by one who obtained it by such a fraud as entitles the original owner to reclaim it from the fraudulent vendee, but not from one who had honestly purchased it from him, this rule has been repeatedly applied. So in case of the sale of real estate by one holding the apparent title, when another is the real owner by an unrecorded deed, the same rule is established. Why should not the same rule apply in case of the sale and transfer of negotiable securities, and thus render the law uniform upon the whole subject? / The reason given by the English judges for a different rule as to mercantile paper is, that such a rule operates as a clog

and impediment to the transfer of such securities, and therefore in restraint of trade, and is put mainly upon the score of policy. But it seems to us that the rule rests on a deeper foundation than any mere question of policy, and is founded upon substantial principles of natural justice, and that no different rule can be adopted consistent with honesty and fair dealing among men. DUER, J., in the case of *Pringle* v. *Phillips*, says "the principle of the doctrine of constructive notice is, that when a person is about to perform an act by which he has reason to believe that the rights of a third party may be affected, an inquiry into the facts is a moral duty, and diligence an act of justice. Hence he proceeds at his peril when he omits to inquire, and is then chargeable with a knowledge of all the facts that by proper inquiry he might have ascertained." It does not appear to us proper that any new rule of policy should be allowed to overbear a principle so just and sensible, nor that the exigences of trade or of commercial men require any abandonment of the ordinary rules of honest dealing among men, or that any class of men should in their dealings be allowed to totally disregard the just rights of others.

It is now a settled rule of law that the purchaser of negotiable paper overdue, takes it subject to all defences which exist between prior parties, and though he pay full value for the paper, and have no knowledge of such defence, or any cause to suspect any except from the papers being overdue, the case is not altered, the rule is inflexible.

The only ground of this rule is, that the fact of the paper not being paid at maturity furnishes ground of suspicion that there is some reason why it should not be paid, and this is enough to put the purchaser on inquiry to ascertain the truth, before making the purchase. If he neglect this he incurs the hazard of all defences which may exist, and his entire honesty and good faith in the transaction will not avail him at all.

The existence of this rule and the reason on which it is founded, seem to be entirely at war with what we think may properly be called Lord DENMAN's doctrine in the later English cases. We are therefore of opinion that the plaintiffs, upon the referee's report, are not entitled to recover the amount of the three notes.

III. This view renders it unnecessary to decide the question raised as to the effect of the judgment recovered by the plaintiffs in New York.

IV. The plaintiffs do not claim that the receipt for lumber is a negotiable instrument that could be transferred to them, so that they can recover upon it as such. This part of the case is put upon the ground that the transfer of the receipt to them was equivalent to a purchase by them of the lumber in the hands of Colvin, Allen & Company, and that they became thereby the owners of it, and that if Colvin, Allen & Company converted the lumber into money they could recover the money under the general counts.

Conceding that the transfer of the receipt made the plaintiffs the owners of the lumber, in order to enable the plaintiffs to recover of the defendants, they must show that the defendants have actually received the money for it.

The case fails to show any such fact; the referee reports that there was no evidence what became of it. The judgment of the county court is therefore reversed, and judgment rendered for the defendant.