BRIGGS, Appellant, vs. HILES, Respondent.

*March 21—April 10, 1894.*

(1) *Reference: Findings: Appeal.* (2) *Attorney and client: Action for services.*

1. Where the evidence is conflicting and involves the credibility of witnesses, a referee's findings stand upon the same footing as the verdict of a jury and should not be disturbed unless against a clear preponderance of the evidence.

2. In an action for the value of services rendered by an attorney at law, it is *held* upon the evidence (stated in the opinion) that the findings of a referee as to the contract between the parties should have been confirmed by the trial court, and judgment in favor of the plaintiff is ordered in accordance with such findings.

APPEAL from the Superior Court of *Milwaukee* County. The facts are stated in the opinion. The plaintiff appeals from a judgment in favor of the defendant.

For the appellant there were briefs by *Quarles, Spence & Quarles,* and oral argument by *T. W. Spence.*

*David S. Rose,* for the respondent.

ORTON, C. J. This action is brought by the plaintiff to recover of the defendant the value of his professional services as an attorney at law, rendered to the defendant in prosecuting and defending actions in court for him, in counseling and advising him, in drafting papers and documents, and in settling and adjusting controversies for him, as his attorney, between the 1st day of January, 1888, and the 1st day of March, 1890; said services claimed to be reasonably worth the sum of $13,650. The defendant, by answer, admitted the plaintiff's professional capacity, and that between the aforesaid dates the plaintiff, at his request, did work, labor, and services for him in defending actions and proceedings, and in prosecuting actions and doing other professional work for him. The defendant, in

further answering, denied any indebtedness to the plaintiff upon any account or to any amount, and alleged that prior to the commencement of the action he fully paid the plaintiff for all services theretofore performed, and settled, adjusted, and paid all the claims and demands of the plaintiff against him; and all other allegations of the complaint are denied; and that the services were rendered under a special contract of $40 per month.

By agreement of the parties, Hugh Ryan, Esq., court commissioner, was appointed sole referee to hear, try, and determine the cause. On the trial before the referee the plaintiff testified to his professional services in eighteen different actions in the various courts, most of them of considerable importance to the defendant. He testified also to services for drawing articles of association; work in connection with United States Labor & Traffic Company; services in connection with Nebraska Land & Improvement Company, of many items; services in connection with Crematory Company; services in connection with lands in Clark county, Wisconsin, and Florida; services in organizing Bank of Pittsville; and services in drawing deeds and contracts, examining titles, and in consultation and advice; and that said services were reasonably worth the sum of $13,650. The plaintiff, when employed by the defendant, had been in the practice of the law about fifteen years, and the defendant had known him twelve or fourteen years, and had employed him as a lawyer before this time. It was in evidence that the plaintiff was a good lawyer, of considerable experience in his profession, and that the defendant thought him to be a good lawyer, and his services were satisfactory to him. The value of the plaintiff's various services was testified to by able lawyers, and the referee found that his services were reasonably worth the sum of $8,000, an amount considerably less than their value as fixed by the testimony of the attorneys. There does

not appear to have been much, if any, question about the services rendered by the plaintiff or their value. On adverse motions to confirm and set aside the report of the referee, the court refused to confirm the report, and made findings of fact, and rendered judgment dismissing the complaint and against the plaintiff for costs and disbursements.

We think the court committed a very grave error in such a disposition of this case. The real and important issue in the case appears in the pleadings. The defendant answered that the plaintiff's services during the time stated were rendered under a special contract of $40 per month, and had been paid for in full. Under this answer the defendant, as a witness in his own behalf, testified to an express oral agreement with the plaintiff, made three or four days before the plaintiff entered upon his employment as an attorney at law, in January, 1888. The defendant testified as follows: The plaintiff was in his employ the latter part of January or the first of February, 1888, to March, 1890. He had known the plaintiff prior to that time twelve or fourteen years. He [the plaintiff] had done business for him before that date,— the company of Powers & Briggs. The plaintiff formerly lived at Grand Rapids, and he lived at Dexterville, Wood county, about fourteen miles from Grand Rapids. He made an agreement with the plaintiff, under which he began work about the last of January, 1888. The agreement was made in his office, 452 East Water street, in Milwaukee. Thomas W. Pitts, Miss Ella Cook, the plaintiff, and himself were present. The agreement was this: He was to give the plaintiff $40 a month for doing all the legal business that he was interested in, and if he was satisfied with his conduct for two or three months he would then buy some books, and give him the use of an office right behind where his office was, and assist him all he could to get all the outside business he could for

him. He began work two or three days after this agree-
ment was made. During the time the plaintiff was in his
employ he did anything that he asked him to do. The $40
a month he agreed to pay was paid him.

The plaintiff, as a witness in his own behalf, testified as
follows: "The day before I went to defendant's office to
go to work, I met him on the street, near the Kirby House.
He told me he wanted me to go to work for the railroad
company; that the railroad company would pay me $40
a month; and that if I was able to do his work he would
give me as much of his other work to do as I was able to
perform. He said the railroad company would furnish me
an office and pay me this $40 a month. I told him I would
need some books. He told me he would buy me $500
worth of books in settlement of our matters and transac-
tions that had taken place between us prior to this time,
and it was talked over at this time. I had a claim against
the railroad company for $130. I had done a good deal of
work for defendant in one way and another. He thought
to settle the whole matter up, and said he would buy me
$500 worth of books to square that up. He bought me the
Wisconsin Reports. I think he paid $145 for them. I
think the other bill came to about $20. He bought some
office furniture,— a desk and some chairs. That was in
settlement of some old matters that existed between us. I
saw him again the next day, at his office. The defendant
was there, and Mr. Pitts, I think, when I went in. There
was some conversation about my work. The defendant
made the remark that I was on hand. It was talked over
that I was going to work. The defendant told Mr. Pitts
that if there was anything he wanted to know about the
labor and traffic company, that he could ask me about it.
I think the defendant called Miss Cook in at that time, and
told her I was going on the company's books for $40 a
month. Gave her instructions to keep account of what

money I should get along. The defendant, at the time we made the bargain for my employment, said that the railroad company would have very little to do; that he wanted me around there, so that he could consult with me about such little things as came up. I asked defendant for a settlement, but he put me off and said he was busy and didn't have time. I would ask him for a settlement again. Sat down one evening, and he told me he was better than, or as good as, any bank in the city, and to leave my money with him and let it accumulate, and I would have something to take care of me in my old age. If I had the money I would squander it. That he would take care of it better than I could."

This testimony of the parties shows the real and important issue in the case. Miss Ella Cook, a witness for the defendant, was his private and confidential clerk, and was present in the office when the talk about the $40 a month took place, and she corroborates the testimony of the defendant in all respects. She testified that she kept the account book in which the payments were entered of the $40 per month, and that it was all paid. The book was in evidence. Mr. Pitts, who was said to have been present in the office, testified that he did not hear all the conversation, but that he heard the plaintiff's salary was to be $45 per month. Then there was the testimony of James Hiles, a son of the defendant, Elihu Blaisdell, Watkins J. Cantillan, and C. O. Baker,— the personal friends and in the employ of the defendant, or connected with him in business or in the employ of his railroads,— that they heard the plaintiff say that he was employed by the defendant at $40 per month. Two or three witnesses testified that when he was dunned by them for money the plaintiff said that he was hard up or that the defendant owed him nothing. This comprises the material testimony of the defendant and his witnesses as to his version of the

contract. The defendant was the president, treasurer, and general manager of, and owned most of the stock in, the Pittsfield & Superior and the Milwaukee, Dexterville & Northern Railroad Companies. The plaintiff had been in the employ of the Chicago, Milwaukee & St. Paul Railway Company, and had done business for the above two small roads, by the employment of the defendant, before the date of this contract. The plaintiff explained that whenever he had spoken of getting $40 per month he had reference to his contract with the defendant to do the business of said railroads under the control of the defendant for $40 per month.

The defendant was evidently a very able man, of great practical experience in important business enterprises, of great energy, aggressiveness, and positiveness of character, and naturally had great control over his subordinates, and influence over those connected with him in business. On the other hand, the plaintiff, although a lawyer of excellent abilities and a safe counsellor, was naturally timid, indolent, and submissive, careless of his own pecuniary interests, peaceful, quiet, and unobtrusive, and had both awe and admiration for his sturdy and commanding employer. These characteristics of the parties must not be overlooked in passing upon the merits and testimony of this unfortunate controversy. The testimony on behalf of the plaintiff in corroboration of his own evidence was that of Burton Hanson, Esq., an able and distinguished attorney of the Chicago, Milwaukee & St. Paul Railway Company. He testified that: "In conversation with the defendant in relation to the plaintiff and the work he was doing for him, the defendant said he was helping the plaintiff to a great deal of work that he had, and was saving his money for him. He spoke of it as a sinking fund that he was reserving for the plaintiff. He said the plaintiff's work was entirely satisfactory, and he regarded him as a good lawyer,— spoke

Briggs vs. Hiles.

of it in that way." On cross-examination he testified that "the plaintiff is still called upon by our company to assist in its litigation." The testimony of Frank B. Lamoreux, another very able and distinguished lawyer, who practices his profession in partnership with B. B. Park, Esq., at Stevens Point, is very strong in corroboration of the testimony of the plaintiff and his version of the contract. Mr. Lamoreux testified that: "On a passenger train on the Wisconsin Central road, between Milwaukee and Waupaca, the defendant said that the plaintiff was trying a case for him against Judge Cate in the city of Waupaca, and that he was going there to attend the trial; that the plaintiff had started and was doing a good law business in the city of Milwaukee; that he believed the plaintiff was the best lawyer in northern Wisconsin; that he was doing his business, and that he would win his case with Cate on the other side in the supreme court, whether he did at Waupaca or not. He said that he considered the plaintiff as able a lawyer as there was in the state, and that John W. Cary said he thought the same. He said that the plaintiff came to Milwaukee without a library or an office; that he was now established, doing a good, paying business; doing all of his [defendant's] business, besides for others; that he knew that plaintiff was making and saving money, because he personally had mailed checks — money or profits — for him to Grand Rapids; and that he knew plaintiff was getting ahead, and doing his part of what was fair. He said, in substance, in that conversation, that the plaintiff was making money and that he [the defendant] was holding it,— making a sinking fund of it,— and that some future day he would have quite a sum, or something to that effect." This testimony is totally inconsistent with the testimony of the defendant that the plaintiff was doing his law business on a contract of $40 per month. This testimony of witnesses of the highest character and of unquestionable veracity is

of the highest possible credibility and weighs against the testimony of the defendant and his favorite witnesses with overwhelming preponderance. It is also in perfect agreement with what the defendant said to the plaintiff when he asked him for a settlement, according to the testimony of the plaintiff, viz.: "That he was better than, or as good as, any bank in the city, and to leave my money with him and let it accumulate, and I would have something to take care of me in my old age. If I had the money I would squander it. That he could take care of it better than I could."

Nearly all the testimony was taken openly before the referee. That taken by deposition was either undisputed or unimportant. In relation to the corroborating circumstances of the case, I will avail myself of the following extract from the report of the referee as a part of this opinion: "The contract claimed by the defendant, while it is binding upon the plaintiff if made by him, is, as it seems to me, unconscionable and unnatural. It is true that the plaintiff is shown to have been a man of very careless habits so far as money is concerned,— a man who had not saved a dollar from his income, whose business methods were lax, and who in consequence was often without funds. But it is also established beyond a doubt that he was a lawyer of far more than average ability and knowledge, with a good professional reputation both as to ability and fidelity to the interests of his clients. At the time the contract, whichever contract it was, was made, he had no office in Milwaukee,— probably no regular office anywhere,— and no considerable general practice. [He had been out of health for a considerable time, but this is not in the report.] But he was in the employ of the Chicago, Milwaukee & St. Paul Railway Company, and appears to have been earning from that company alone enough for his support. He must have had more or less knowledge of the nature and amount of

the service the defendant was likely to require of him, for he had done business for the defendant to some extent for many years; and it seems almost beyond belief that he should have contracted to perform all those services for the wages of a day laborer. Far more inexplicable does it appear that, if he had made such a contract for no definite period of time, at liberty to terminate it at his will, he should have continued it for upwards of two years, during which time he performed for the defendant services which even defendant's counsel, leaving out of consideration a number of items, values at $3,000, and which, in my judgment, are shown to have been worth more than double that sum. It is certainly repugnant to reason and common sense to believe that the plaintiff, after he had discovered that the defendant's business was large, intricate, and important, and occupied nearly his whole time, should have continued to do that business, and do it admirably, for $40 a month and the use of office, fuel, lights, and furniture thrown in. On the other hand, the plaintiff's version of the contract is — whether it be correct or not — reasonable and natural. The defendant, as president of his two railroad companies, has his office in Milwaukee. The companies had little litigated business, but, in the nature of things, there must have been frequent — almost daily — need of legal counsel in the management of its affairs. Forty dollars a month, while it was clearly a most inadequate compensation for the services rendered to the defendant individually, was probably a reasonable salary, under all the circumstances, to be paid by the companies for such services as they required. So that, if the question rested solely upon probability and reason, it would present little difficulty."

Aside from these circumstances and probabilities, which have considerable weight in determining the issue, the testimony is conflicting and contradictory, and involves the credibility of the principal witnesses. In such a case it

must be conceded that the referee had advantages and facilities, from having heard the testimony and observed the witnesses, to make a correct decision of the case, superior to those of the court upon the mere record of the evidence. If these findings had been made by a jury, instead of a referee, the jury would have been held to be the exclusive judges of the weight of the testimony and of the credibility of the witnesses. *Morrow v. Delaney*, 41 Wis. 149; *Langton v. Hagerty*, 35 Wis. 150; *Bowe v. Rogers*, 50 Wis. 598; *Brusberg v. M., L. S. & W. R. Co.* 55 Wis. 106; and many other cases in this court. "The jury must reconcile discrepancies in the testimony of the witnesses, if possible, and, if not, decide whether they are equally credible." *Moore v. Kendall*, 2 Pin. 99; *Kuehn v. Wilson*, 13 Wis. 104. But in any case it is an elementary rule that the verdict of a jury will not be disturbed unless against a clear preponderance of the evidence. In these respects the findings of a referee stand precisely like the verdict of a jury. "The findings of a referee will not be disturbed when the evidence is conflicting, or there is any evidence tending to support them." *Southbridge Sav. Bank v. Mason*, 147 Mass. 500; *Marshall v. Bumby*, 25 Fla. 619; *Mayer v. Hazard*, 49 Hun, 222; *Snyder v. O'Connor*, 50 Hun, 604; *Perry v. Hardison*, 99 N. C. 21. "The findings of a referee are to have the same force and weight as the verdict of a jury, and they will not be disturbed unless clearly against the weight of evidence." *Noonan v. Hood*, 49 Cal. 293; *Whicher v. The Ewing*, 21 Iowa, 240; *Lyons v. Harris*, 73 Iowa, 292; *Gimbel v. Pignero*, 62 Mo. 240; *Fitch v. Archibald*, 29 N. J. Law, 160; *McCarthy v. Teale*, 51 Hun, 638; *Roth v. Colvin*, 32 Vt. 125; *Thayer v. Central Vt. R. Co.* 60 Vt. 214; *Watson v. Campbell*, 28 Barb. 421; 20 Am. & Eng. Ency. of Law, 708; Edw. Ref. 14. It would seem almost supererogation to apply these rules to the findings and report of the referee in the case, when they are not only

not against the weight of the evidence, but are supported by a clear preponderance of the evidence.

The decision of the referee upon the whole evidence is clearly vindicated by the apparent merits of the case, and does not really need the protection of these rules; but these rules ought at least to have governed the superior court, and restrained it from setting aside the report of the referee and rendering an adverse judgment on the credibility of the testimony. This was not a compulsory reference, but by agreement of the parties, and they selected Hugh Ryan, Esq., a referee, to hear, try, and determine the matters of this action. It is not unlike an arbitration. Coop. Ref. 4; *McFarlane v. Cushman*, 19 Wis. 357. In such a case, where the parties have selected their own court to try their case, they ought not to ask the court in which the action is pending to set aside the findings of their own referee, and reverse his judgment, simply because the court may have a different opinion of the effect of the testimony or of the veracity of the witnesses. I do not wish to intimate that the report of a referee chosen by consent should be treated like the award of an arbitrator, but do insist that where the evidence is conflicting and involves the credibility of witnesses the referee's findings should be final and conclusive, and in all other cases his findings should not be disturbed unless against the clear preponderance of the evidence, with strong presumption in their favor. The referee is a very able lawyer, of fair and impartial judgment and considerable experience in the trial of referee cases, and the parties might very well choose him to try their case, instead of the court. His report is very full, and disposes of every material question. His reasoning is clear and cogent, his comparison and balancing of the conflicting testimony honest and just, and his conclusions logical and sequential. He appears to have tried the case with great care and scrutinizing impartiality. We think the court should have con-

firmed the report of the referee and rendered judgment upon it in favor of the plaintiff for the sum found by him.

*By the Court.*— The judgment of the superior court is reversed, and the cause remanded with direction to confirm the report of the referee and render judgment in favor of the plaintiff and against the defendant for the sum of $8,000, with interest since the commencement of this action, as found by the referee.