SLAUSON, Respondent, vs. GOODRICH TRANSPORTATION COM-
PANY, Appellant.

*November 27, 1896 — January 12, 1897.*

*Ejectment: Boundaries: Low-water mark: Evidence.*

1. Low-water mark on a fluctuating lake or other body of water is the
level at which the waters of the lake usually stand when free from
disturbing causes.
2. In an action of ejectment to recover a strip of land along the shore
of Lake Michigan, between the boundary of premises conveyed by
one T. to defendant's grantor in 1858 by courses and distances,
and the present low-water mark of the lake, findings of the trial
court that at the time of such conveyance there was an irregular
strip of land between defendant's boundary and the lake, and that
subsequently T. was in possession of such strip claiming title
thereto and making improvements thereon, are *held* not to have
been against the clear preponderance of the evidence.

APPEAL from a judgment of the circuit court for Racine
county: D. H. JOHNSON, Judge. *Affirmed.*

This was an action of ejectment, for the recovery of an
undivided three fourths of twenty-three one hundredths of
an acre of land in the city of Racine, on the shore of Lake
Michigan, at the mouth of Root river, described by courses
and distances, and being all the land lying between Root
river on the north, Lake Michigan on the east and southeast,
and a certain piece of land on the west, described in a deed
thereof from Isaac Taylor to William H. Waterman, dated
September 22, 1858, and recorded in volume 38 of Deeds,
page 373, in the register's office for Racine county.  The
answer was a general denial, and the question in controversy
was whether at the time the deed was executed by Taylor
to Waterman, which described the premises so conveyed by
courses and distances, the said premises extended to and
bordered on Lake Michigan on the east and southeast, so
that the grantee, Waterman, became a riparian owner on

the lake, and as such entitled to the lands thereafter gained or added thereto by accretion, as claimed by the defendant, who was a remote grantee of said Waterman. The plaintiff, on the other hand, claims the premises in dispute by a regular chain of title from and under the same grantor, Taylor, but contends that at the time of the conveyance by Taylor to Waterman the latter did not become a riparian owner on the lake, but that a strip of land intervened between the premises so conveyed to him and the lake, and that Taylor, and those claiming under him, remained seised thereof, and were such riparian owners, and as such took title to all the land gained or added on the lakeside to such strip, by accretion or otherwise; such strip and gains thereto constituting the entire twenty-three one hundredths of an acre described in the complaint.

There was a trial by the court without a jury, and a finding in favor of plaintiff, from which it appeared substantially that the premises owned by Taylor before his conveyance to Waterman were described as that part of blocks 7 and 67 of the original plat of Racine lying between the Root river and Second street, " bounded as follows: Beginning on the north line of Second street, 140 feet easterly from the east line of Chatham street; thence north, nine degrees west, 149 feet; thence north, one degree and twenty-five minutes west, 114 feet, to the Root river; thence easterly, along said river, *to Lake Michigan;* thènce *along the shore of Lake Michigan* to the north line of Second street; thence westerly, along the north line of Second street, to the place of beginning." The premises conveyed to Waterman, under whom the defendant claims, are bounded in the deed to Waterman as " beginning on the north line of Second street, 403 feet easterly from the east line of Chatham street; thence north, nine degrees west, 149 feet; thence north, one degree and thirty-five minutes west, 114 feet, to the [Root] river; thence easterly, along the river, *sixty feet; thence*

*south, one degree thirty-five minutes east, 113 feet; thence south, nine degrees east, 140.75 feet,* to the north line of Second street; thence westerly, along the north line of Second street, to the place of beginning."

Taylor, under whom the plaintiff claims, died prior to May 23, 1866, having devised all of his real estate to his wife, who on the day last named executed a deed of conveyance to Kelley, Murray, and Slauson, under whom the plaintiff claims, of the following parcel of land in Racine, among others: "Beginning in the north line of Second street, 140 feet east of the east line of Chatham street; thence northerly parallel with Chatham street to the river; thence along the south side of the river *to Lake Michigan;* thence southerly, *along the shore of Lake Michigan,* to the north line of Second street; thence westerly on said street to the place of beginning; *except that part of said premises hereinbefore described as having been conveyed* on September 22, 1858, to William H. Waterman." The court also found "that on the 22d day of September, 1858, and from thence hitherto, there had been an irregular strip of land extending from the river to Second street, lying between the easterly boundary of the land included and embraced in the deed hereinbefore mentioned from said Taylor to William H. Waterman and the shore of Lake Michigan; that subsequent to said grant to said Waterman, during the year 1859 and thereafter, the said Taylor was in the actual possession of said strip of land lying between the east line of Waterman's grant and Lake Michigan, claiming title thereto, and in connection with one Cornell, mortgagee of the Waterman tract, making expensive and valuable improvements thereon, namely, building a large crib to protect said strip of land against the encroachments of Lake Michigan, and that at divers times thereafter said Kelley, Murray, and Slauson, and George W. Slauson, paid the taxes thereon for many years." The plaintiff had judgment, from which the defendant appealed.

For the appellant there was a brief by *Dodge & Fish*, attorneys, and *Thomas M. Kearney*, of counsel, and oral argument by *Mr. Kearney*.

For the respondent there was a brief by *Quarles, Spence & Quarles*, attorneys, and *John T. Fish*, of counsel, and a separate brief by *Fish & Cary*, of counsel, and oral argument by *T. W. Spence* and *John T. Fish*.

PINNEY, J. The question whether at the time of the conveyance from Taylor to Waterman (September 22, 1858) the premises described therein extended to the waters of the lake at ordinary low-water mark was purely a question of fact, upon which the evidence is conflicting, and the finding of the trial court is challenged on the ground only that it is against the clear preponderance of the credible evidence. The boundary of Taylor's lands on the east was the shore of Lake Michigan, and if, after satisfying the calls in the deed from Taylor to Waterman, there remained a strip of land between the land so conveyed by Taylor to Waterman and the waters of the lake at low-water mark, then Waterman did not acquire the rights of a riparian owner on the lake, but such rights were retained by Taylor. By low-water mark we understand that where the level of the lake, or other body of water, is not constant, but is fluctuating, ordinary low-water mark is intended (*Diedrich v. N. W. U. R. Co.* 42 Wis. 248), or the line or level at which the waters of the lake usually stand when free from disturbing causes (*Seaman v. Smith*, 24 Ill. 521). If the eastern line of the grant to Waterman was in fact substantially coincident with the shore of the lake at low-water mark, then the fact that no mention was made of the lake as a boundary will not overcome the presumption of the intent to convey to low-water mark of the lake (*Norcross v. Griffiths*, 65 Wis. 610), unless a contrary intention is manifest from the language of the deed. It is somewhat singular that in describ-

ing the premises granted by the calls in the deed in the direction of the lake the grant was limited to sixty feet, when, in any view that may be taken of the case, the land did not then extend to the eastward of the limit of sixty feet more than from twelve to twenty feet, and the calls or boundary in the deed of the grantor of Taylor expressly extended to the lake, and south along its shore. These facts are entitled to weight in considering whether the parties did or did not understand that Taylor still retained land to the east of the grant to Waterman, and along the shore of the lake. Riparian rights "are incident to riparian ownership, and exist with it, and pass with the transfer of the land. The land must not only be contiguous to the water, but in contact with it. Proximity without contact is insufficient." *Ill. Cent. R. Co. v. Illinois*, 146 U. S. 387; *McLennan v. Prentice*, 85 Wis. 444; *Diedrich v. N. W. U. R. Co.* 42 Wis. 248.

This is a legal action, and the findings of the trial court will not be set aside or disregarded unless the record shows them to be clearly contrary to the preponderance of the evidence. *Althouse v. Baldwin*, 56 Wis. 398, and previous cases there cited; *Zimmerman v. Chambers*, 79 Wis. 23, 24. Particularly is this true where the evidence is conflicting, and involves the question of the credibility of witnesses. *Briggs v. Hiles*, 87 Wis. 438. The present case illustrates in an especial manner the wisdom and importance of the rule. The vital point in issue is as to the location of the ordinary low-water line of the lake at the time when the deed from Taylor to Waterman was executed, and the controversy relates to a small piece of ground on the south side of the harbor at Racine, which was formerly on the north side of Root river, near where it entered the lake, and which was formerly the point of entry and departure of vessels. The land immediately adjoining was low and sandy, and the southerly current of the lake, by alluvial deposits, had turned

the course of the river near its mouth, so that, instead of entering the lake in a direct easterly direction, it entered in fact in a southeast direction from its general course, and some distance south of its present location, and north of Second street. In 1842, when the work of improving the harbor was commenced, a channel was cut from the turn in the river almost directly east into the lake, and there was quite a bayou near to and where the old channel came in. The old bed of the river and the bottom of the bayou were much lower than the land on either side, and until filled up by material carried in from the lake, and otherwise, were full of water. Taylor owned the land on both sides of the old river, and up around the bayou, and of course the bed of both. During the prevalence of storms, the waters of the lake rushed at times quite a distance in and upon the low, sandy land, so that it was washed and worn, and material was at other times brought in from the lake, and the condition of affairs was changing and by no means constant. The evidence tended to show that land had been constantly gaining by accretion from the lake. It appeared that the level of the waters in Lake Michigan has been subject to very material and considerable changes from time to time of from five to five and one-half feet; the highest point known to have been reached was in 1838, and the lowest in 1895. In the early part of 1858 the water was between two and three feet lower than later in that year, and subsequently, when the warehouse known as the Waterman warehouse was moved from Fourth street, north, along the lake shore, to the north side of the premises conveyed to Waterman, where it was placed upon a pile foundation, even with the east side of the said Waterman lot, during the year 1859, the water was higher than at any other period between 1838 and 1895. But in the summers of 1861, 1871, 1876, 1883, and 1886 the water was again as high, within a few inches, as in 1859, and its height between these periods

and 1895 has been fluctuating. The lowest points reached were in November, 1864, February, 1866, 1867, 1869, 1872, 1873, and 1879, when the water was about three feet lower than in 1859; but in 1891, 1892, and 1893 the water was about four feet lower than in 1859, and in the fall of 1895 it was nearly five feet below that point. The high water of 1838 was about one foot above any of these notations, but the condition of the lake level between 1838 and 1858 did not appear. Still it is fair to presume that in the seasons during that period it was variable, as between 1859 and 1895.

These facts serve to illustrate the great difficulty of showing what was the ordinary low-water mark at any given period as remote as September 22, 1858, the date of the conveyance in question, by the memory of living witnesses. Under such circumstances, each party is able to produce a very considerable amount of evidence, to satisfy the requirements of his case, from honest and truthful witnesses, but without approximating, perhaps, very nearly to, the real point in issue. Upon the question whether there remained a strip of land between the premises granted by Taylor to Waterman and the lake shore at low-water mark, the examination of twelve witnesses on each side was allowed. The evidence is voluminous, and took a wide range, involving the memory of witnesses in relation to the particular point, and those collateral thereto, the conduct and acts of parties interested, and certain physical facts relied on upon either side.

It would serve no useful purpose to make a condensed statement, or to enter upon a discussion of the evidence with a view to determine whether it preponderates in favor of the plaintiff or defendant. The trial judge had facilities for determining the credibility and weight due to the testimony of each witness, having heard them testify, and abundant opportunity for viewing the premises, and the situation and

relation of the various points referred to in the testimony. On the part of the plaintiff there was abundant evidence to sustain the finding, and, had it been in favor of the defendant, the evidence produced on its part must be regarded as sufficient to have sustained a finding in its favor. The testimony was mainly directed to the condition of the shore, and events that occurred in 1859 and a few succeeding years. During that period the waters of the lake were unusually high, and about the time the Waterman warehouse was moved north along the shore from Fourth street, and placed at the eastern edge of the Waterman lot, immediately adjoining the harbor, witnesses on behalf of the plaintiff testified that when there was no storm there was always land outside of the Waterman lot, and when there was a storm there was no land around there until the storm went down; that the sea would run from four to six feet high, and go the whole length under the warehouse into the lumber yard west of it, and that a pier was put in to prevent it; that during 1858, and shortly prior thereto, while there was still water, or when the lake was at ease, there would be ten or twelve, and some witnesses said twenty, feet of beach beyond the line where the Waterman warehouse was placed, and sometimes when there was a west wind there would be considerably more. A protection, made of cribs loaded with stone, was put in, north and south, ten or twelve feet east of the warehouse, and when the storms came the water passed over it, and eventually filled up under the warehouse, and there was a beach still outside of the warehouse. This beach extended south near to Second street, and at the south end of the protection was of varying width. Then again it would be much wider right opposite the warehouse. The protection appears to have been built at the expense of Taylor, and by the consent and co-operation of one Cornell, mortgagee of the remainder of the Taylor property, and the remote grantor of the defendant. It started at the end of

Taylor's dock, about ten or twelve feet east of the line of the Waterman grant; and the government works and pier commenced at that point, and extended out a considerable distance into the lake. The evidence of the witnesses on the part of the defendant was to the effect that there was no beach or land between the Waterman grant and the waters of the lake; that the pier protection was built out in the water where it was of varying depth, of from two to six feet, and the shore of the lake in a southerly direction curved somewhat to the west before reaching Second street. Numerous maps, plans, and sketches of the *locus in quo,* made at various periods, were used as evidence, tending to establish the location of the shore line.

Beyond this general recapitulation, further statement is not material. The inherent difficulty of ascertaining whether the finding is against the clear preponderance of the evidence, from the evidence as it appears in this court, and from the numerous plats, plans, and sketches, renders further discussion unprofitable. After a careful consideration of the evidence as it appears in the record, we cannot undertake to say that there is a clear preponderance of the evidence against the finding of the trial court, such as would justify us in reversing the judgment appealed from. As already observed, we are without the means and advantages which the trial court had to test the weight and credibility of the testimony of witnesses in relation to conditions and occurrences so remote from the time of trial, and which, if of recent date, would still be involved in considerable doubt and obscurity, rendering the vital question in the case difficult of solution. For these reasons, therefore, the judgment of the circuit court must be affirmed.

*By the Court.*— The judgment of the circuit court is affirmed.