EMMETT IRR. DIST. et al. v. THOMPSON et al.[*]

(Circuit Court of Appeals, Ninth Circuit. October 7, 1918.)

No. 3062.

1. WATERS AND WATER COURSES ⚌230(2)—IRRIGATION DISTRICTS—VALIDITY OF BONDS.

Under Rev. Codes Idaho, §§ 2396, 2397, providing that bonds of an irrigation district shall be authorized by a vote of the electors, shall be designated as a series, and may be issued and sold from time to time, but shall be dated January 1, or July 1, next following their authorization, they are properly signed by the officers of the district in office at the time of their issuance.

2. ESTOPPEL ⚌62(1)—IRRIGATION DISTRICTS—VALIDITY OF BONDS.

An irrigation district, which issued bonds under a contract made without fraud, and with full knowledge of the facts, requiring the other party in part payment to take up certain claimed liens on the property, is estopped to afterward question the validity of the bonds on the ground that some of the lien claims paid were invalid.

Appeal from the District Court of the United States for the Second Division of the District of Idaho; Frank S. Dietrich, Judge.

Suit in equity by J. Paul Thompson and others against the Emmett Irrigation District and others. Decree for complainants, and defendants appeal. Affirmed.

J. M. Thompson, of Caldwell, Idaho, and Fremont Wood and Dean Driscoll, both of Boise, Idaho, for appellants.

Richards & Haga and McKeen F. Morrow, all of Boise, Idaho, for appellees.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

ROSS, Circuit Judge. The bonds here in suit are a part of an authorized issue of $1,100,000, par value, made by the appellant irriga-

---

tion district, and, except as to numbers, amounts, and dates of maturity, are identical. Each is a coupon bond, negotiable in form, and made payable to bearer, and recites upon its face, among other things, that it is one of a series of bonds aggregating $1,100,000 in amount and issued by the district by authority of an act of the Legislature of the state of Idaho entitled "An act relating to irrigation districts and to provide for the organization thereof, and to provide for the acquisition of water and other property and for the distribution of water thereby for irrigation purposes, and for other and similar purposes," approved March 9, 1903, (Laws 1903, p. 150), together with acts amendatory thereof and supplemental thereto, and further recites as follows:

"And it is hereby certified that all things required by law to be done in and about the organization of said district and the issuance of the said bonds have been done, have happened, and have been performed, and that the issuance of this bond is duly and legally authorized by vote of the electors of said district at a special election duly called and held in accordance with the provisions of the said act and by resolution of its board of directors, and that all other acts, conditions, and things required by the laws and Constitution of the state of Idaho precedent to and in the issue and delivery of this bond have been done, have happened, and have been performed, and that said bonds are the valid, binding, and legal obligation of the said district; that all the real property included within said distrct is subject to the levy of an annual tax for the payment thereof."

The record shows that the irrigation works were constructed by a company styled Canyon Canal Company, Limited, under contract with the state of Idaho, pursuant to certain provisions of the statutes of that state and under the provisions of an act of Congress approved August 18, 1894 (28 Stats. Lg. 372, c. 301), and amendments thereto, known as the Carey Act (Comp. St. 1916, § 4685). Those statutory provisions are specifically referred to in the opinions of this court on the former appeal of the present case (227 Fed. 569, 142 C. C. A. 192), and in the recent case of Twin Falls Salmon River Land & W. Co. v. Caldwell, 242 Fed. 177, 155 C. C. A. 17, and need not, therefore, be again set out. The canal company sold to various settlers and prospective settlers rights to water under the system for the irrigation of their respective tracts of land, liens for the purchase price of which were given both by the act of Congress and the statute of Idaho.

For the purpose of acquiring the irrigation works and water rights of the canal company, and of extending and improving the same, the appellant irrigation district, shortly after its organization, authorized the issue of bonds in the amount of $1,100,000, par value, and under and by virtue of the statutes of Idaho (Revised Codes of Idaho, §§ 2401, 2403) instituted in the proper court of the state proceedings to have it judicially determined that the district had been legally organized, that the bonds had been properly authorized, and would be in the hands of purchasers legal and valid obligations of the district, the obvious purpose of which proceedings was to further the sale of the bonds by giving such legislative and judicial security to their purchasers. The confirmation proceedings resulted in a decree of the trial court adjudging the organization of the district and the issuance of the bonds to be regular and valid—the decree setting out, according to

the express declaration of the Supreme Court affirming it, the "various steps taken for the organization of the district and of the issuance of said bonds." Emmett Irr. Dist. v. Shane, 19 Idaho, 332, 335, 336, 113 Pac. 444, 445.

The record shows that thereafter the district, through its board of directors, offered the whole amount of the bonds for sale, and that in response to due notice there was no bid. The canal company had sold water rights in the system to various settlers upon the lands under contracts on which there was payable to the company more than $600,-000 in deferred payments, which contracts were liens both upon the lands of the settlers and their interests in the irrigation system. The canal company, in the course of building up the system, had issued bonds, notes, and other obligations, and given as security therefor a mortgage or trust deed to the American Trust & Savings Bank of Chicago on the irrigation system, including its water rights, and, as additional security, had deposited with the trustee the various water contracts it had entered into with the settlers. Some of the obligations of the canal company were due, and on others there was default in the payment of interest. There were also various existing liens upon the property for work and labor performed for, and materials furnished to, the canal company, and there was also some claim by a company called Trowbridge & Niver Company. Litigation and expense, therefore, confronted both the canal company and the district. In that condition of affairs the latter, on the 12th of September, 1911, entered into a contract with J. J. Corkill & Co., of Chicago, next referred to, prior to which, however, the district had acquired (through a holding company to which the canal company had conveyed it) the entire irrigation system.

The contract between the district and Corkill & Co., and a supplemental one between the same parties, as well as the facts in connection therewith, are, we think, after a careful examination of the record, fairly set forth in the following excerpt from the opinion of the learned judge of the court below:

"After reciting that the district was desirous of purchasing the irrigating system (to which, as we have seen, it already had title), and that Corkill was able to sell and deliver it, and further reciting that there were outstanding bonds and notes of the Canyon Canal Company aggregating $570,000, besides interest, secured by mortgages and water contracts, and that it was the desire of the district to pay all these obligations, and to lift all incumbrances upon and claims against the irrigation system, and to procure funds for the extension and improvement thereof, and reciting further that Corkill & Co. were able to give valuable assistance in making an exchange of the district bonds for such outstanding obligations, and were willing to purchase the bonds not required for that purpose, it was agreed that Corkill & Co. would use their best efforts to consummate the desired exchange, and would cause to be transferred to the district the entire irrigation system, and would further cause to be assigned to it an unsecured claim of the Trowbridge & Niver Company against the Canyon Canal Company, the precise nature of which is not explained. The Ft. Dearborn Trust & Savings Bank of Chicago was agreed upon as a depository, and with it the district was to deposit the entire issue of its bonds, for delivery from time to time as they were exchanged or sold by Corkill & Co. When the obligations of the canal company were finally discharged by exchange or payment, the water contracts which the canal company had deposited as collateral with the trustee of its bonds and notes were

to be turned over to the district. These aggregated $525,469.62 principal, and $76,868.16 interest, and there was also in the hands of the trustee cash to the amount of $28,197.94, making a total of principal, interest, and cash of $630,535.72, all of which was to go to the district as soon as the canal company's obligations were discharged in the manner hereinafter recited.

"The $1,100,000 bonds were to bear date January 1, 1911, and the coupons maturing July 1, 1911, were to be detached before delivery to the depository. The depository was to hold the bonds and deliver them in the following manner, namely: Four hundred and seventy thousand dollars to Corkill & Co., or upon their order, in even exchange for $470,000 of the bonds and notes of the Canyon Canal Company, and Corkill & Co. were to pay to the holders of such outstanding bonds and notes any excess of accrued interest thereon, for which they were to be reimbursed out of the $28,197.94 cash in the trustee's hands, and $130,000 on account of the other $100,000 of bonds and notes and the accrued interest thereon, aggregating, principal and interest, $130,000. Two hundred and eighty thousand dollars of bonds were to be delivered upon payment to the credit of the district of cash equal to the par value thereof and accrued interest. The consideration for the other $220,000 bonds is not so clear. It was provided that they were to become the property of Corkill & Co. when the latter caused to be delivered to the depository proper instruments transferring to the district the irrigation system and the unsecured claims of Trowbridge & Niver Company, but they were to be held by the depository as security for the performance by Corkill & Co., of their obligations under the contract, among which was the obligation to purchase the $280,000 bonds in cash at par. These $280,000 bonds they were to take in installments, $50,000 in 30 days, $50,000 in 60 days, $50,000 in 90 days, and $130,000 on or before August 1, 1912. Provision was made for the delivery by the depository to Corkill & Co. of the $220,000 bonds, the details of which need not be stated, for in general the depository was at all times to retain of such bonds an amount equal to 25 per cent. of the then outstanding unexchanged obligations of the canal company, plus the amount of $280,000 bonds which Corkill & Co. had not taken and paid for in cash.

"The district further agreed to get from all landowners a written waiver of all errors and irregularities of procedure, together with consent that their lands be taxed to pay the interest and principal of the bonds. Corkill & Co. failed to purchase the whole of the $280,000 bonds within the time agreed upon, and on September 12, 1912, a supplemental agreement was executed, which, after reciting such default, provided for an extension of time to complete such purchase. It was also agreed that $5,000 of the $220,000 bonds, and $20,000 of the $280,000 bonds, should, by the depository, be returned to the district.

"There was still another contract between the parties, with a view to effecting the disposition of the bonds for cash; but it is unimportant at the present juncture, for generally it may be said that such bonds as are outstanding were disposed of under the contractual arrangement and for the considerations already explained. Of the bonds now out approximately $599,000 were exchanged in retiring the obligations of the Canyon Canal Company, as was contemplated by the agreement. Of the balance, $125,000 were sold for cash, $175,000 were delivered to Corkill & Co. on account of the $220,000, and $25,000 were, by agreement of the parties, returned to the district. The depository still has in its possession approximately $177,000. The contract was complied with in every respect, except that Corkill & Co. did not purchase for cash more than half of the stipulated amount of bonds; but admittedly this default does not affect the validity of the bonds which are actually outstanding, all of which were issued in compliance with the contract. It is further to be borne in mind that the issuance by the district of the bonds to the amount of $1,100,000 was duly authorized, and the district was not induced by any fraudulent practices on the part of Corkill & Co. to enter into the contract. The defenses are therefore limited to claims that the bonds are irregular in their form and in the manner of their execution, and that many of them, as appears from the contract and the explanatory testimony, were disposed of for an illegal consideration."

[1] We agree with the court below that the objections made to the form of the bonds and the manner of their issuance are without merit. The provisions of the statute under which they were issued are quite different from those of the California statute considered by this court in the case of Wright v. East Riverside Irr. Dist., 138 Fed. 313, 70 C. C. A. 603, and therefore the decision in that case is not in point. The Idaho statute (Rev. Codes, §§ 2396, 2397) declares that the bonds authorized by the vote of the electors of the district "shall be designated as a series and the series shall be numbered consecutively as authorized," and that "all bonds and coupons shall be dated on January 1st or July 1st next following the date of their authorization." Providing, as the Idaho statute does, for the issuance of authorized bonds in series and for their sale from time to time, all, however, to be dated on January 1st or July 1st next following the date of their authorization, and there being no express statutory provision as to who should sign them, the obvious and necessary implication is that they were authorized to be signed by the officers of the district in office at the time of their issuance and delivery.

[2] The court below found and held that all of the parties to the contract between the irrigation district and Corkill & Co. knew all of the facts, and that there was no fraud practiced, notwithstanding the untrue recital therein that the district desired to purchase the canal system, the title to which had already been conveyed to it. "Undoubtedly," said the court, "there were outstanding bonds, notes, and contracts which were claimed to be charges upon the property. The district officers could at their option have questioned them at the time the contract was entered into, and declined to include any particular bonds or claims; but manifestly they either recognized their validity, or deemed their invalidity so doubtful that they were unwilling to assume the burden of a contest. The district has now had all of these liens and charges cleaned up, and has gotten the consideration for which the bonds were issued, and it cannot be heard to say that some of the claims might have been defeated if a contest had been instituted. In good conscience it would have to restore the consideration and put the parties in statu quo, and that it does not offer to do, and probably could not do. The transaction in this respect being within the scope of the directors' authority, their action is at this late date conclusive, in the absence of fraud, and no fraud is charged."

All this being true, and the record showing that a large part of the bonds in suit were used in the payment of the works of the irrigation system, as under section 2404 of the Revised Codes of Idaho it seems could be legally done, and the remainder of such bonds having subsequent to their delivery to the depository passed into the hands of purchasers for value, even if it be assumed that the consideration for some of the latter bonds was illegal, it appears from the record that the one could not be identified from the other. It hardly seems necessary to cite the numerous cases upon the subject of estoppel. How strictly that rule is enforced by the Supreme Court

of Idaho in favor of holders of bonds of irrigation districts is clearly shown by the case of Page v. Oneida Irrigation District, 26 Idaho, 108, 141 Pac. 238. ·Indeed, we think that the application of the doctrine of estoppel, and the decision of this court on the former appeal (227 Fed. 560, 142 C. C. A. 192) are enough to make necessary the affirmance of the judgment appealed from.

Judgment affirmed.