189 P.2d 1009

**PAYETTE LAKES PROTECTIVE ASS'N v. LAKE RESERVOIR CO.**

No. 7333.

Supreme Court of Idaho.

Jan. 28, 1948.

As Corrected on Denial of Rehearing Feb. 24, 1948.

T. L. Martin and Fred M. Taylor, both of Boise, for appellant.

J. L. Eberle, Carey H. Nixon and Paris Martin, Jr., all of Boise, for respondent.

GIVENS, Chief Justice.

Respondent (plaintiff below) is an Idaho non-profit, membership, no-capital-stock corporation organized March 19, 1924, to— among other things—promote the improvement and development of Payette Lakes and the surrounding region into a more

beautiful and useful State Recreational Park; encourage, aid and assist in the development and establishment of amusements, entertainments, recreational and healthful enjoyments and activities of all wholesome natures suitable for that locality; protect this region and Payette Lakes from all injurious uses or any encroachments opposed to the fullest and best use as a recreational park; purchase, hold and convey real and personal property and affiliate or associate with itself similar associations.

Appellant is an Idaho corporation organized and existing for the purpose, among others, of acquiring, owning and distributing water for beneficial purposes upon the lands of its stockholders, Emmett Irrigation District, Farmers' Cooperative Company, Letha Irrigation Company, Enterprise Ditch Company and Lower Payette Ditch Company in Gem and Payette Counties, encompassing an irrigated area of approximately 65,000 acres, highly productive of agricultural and horticultural crops.

Pursuant to then Section 5574, Idaho Complied Statutes, now Section 41-208, I.C.A., hearing for submission of proof of completion of a storage appropriation for 50,000 acre feet of water in Big Payette Lake by appellant, acquired from the original applicant W. A. Coughanour, was noticed and advertised by the Commissioner of Reclamation for October 30, 1924, to be held before the Probate Judge of Valley County at Cascade. Thereupon, an adverse 17-point protest was interposed by Carl E. Brown, Charles W. Luck, Paris Martin, William B. Boydston and Fenton G. Cottingham, as individuals and property owners, owning property upon the shores of Big Payette Lake, and respondent, reciting it was then composed of 150 residents, taxpayers, and property owners of the State, for themselves and all persons similarly situated.

Ensuing negotiations between protestants and appellant and relevant correspondence resulted in a contract[1] executed by the ap-

---

[1] "This agreement, entered into this 8th day of November, 1924, by and between Payette Lakes Protective Association, a corporation, of Boise, Idaho, and hereunto duly authorized by resolution of its directors, party of the first part and the Lake Reservoir Company, a corporation, of Payette, Idaho, being hereunto duly authorized by resolution of its board of directors, party of the second part; Witnesseth:

That for and in consideration of One Dollar and other good and valuable considerations from the party of the first part, the receipt of which is hereby acknowledged by the party of the second part, the said party of the second part agrees to and with the party of the first part:

That under use permit Number 14689 and storage permit R 216 for the waters of Big Payette Lake, proof of completion of works for which was made on October 30, 1924, at Cascade, Idaho, the party of the second part for itself, its successors and assigns, hereby agrees, that it claims and will claim no right, title, or interest of any nature whatsoever, to raise the waters of Big Payette Lake above the normal high water line or to lower the waters of Big Payette Lake below the normal low water line, and said party of the second

propriate, duly authorized officers of both contracting corporations.

The protest was accordingly ·withdrawn and the permit or certificate of completion of reservoir and right to store water was issued December 8, 1924.

In the present suit, respondent sought and secured an injunction restraining appellant from violating the contract by excessively raising or lowering and unseasonably holding water in the Lake.

The amended complaint alleged respondent's corporate existence and capacity with membership comprising owners and lessees of lands and property fronting upon and having beaches along the shores of the Lake, the making of the contract, incorporating it in the complaint, and "That said defendant, notwithstanding said agreement of November 8, 1924, has asserted rights contrary to and in excess of those specifically provided for in said agreement, has failed to comply with the terms thereof,

and has violated the provisions and agreements therein contained, and in particular (a) has· raised the waters of said Big Payette Lake above the normal high water line and upwards of four feet beyond such line; (b) has lowered the waters of said Big Payette Lake below the normal low water line; (c) has asserted a right to use and has used waters of ·said Big Payette Lake in excess of those between the· normal high and low water lines thereof;, (d) has failed to draw off said waters so· as to interfere as little as possible with the bathing beaches on the shores of said lake, but on the contrary, has drawn off such waters as to greatly interfere with the bathing beaches on the shores of said lake and the use thereof by the plaintiff herein and its members in that during the· months of June, July and August, the Defendant did, by means of dams and headgates, so obstruct the natural flow of the water of said Big Payette Lake as to cause said water to raise to the extent of about

---

part hereby further agrees: That it will not assert any right to the use of any waters of said Big Payette Lake except such waters as are between the normal high water line and the normal low water line and that the party of the second part will draw off said stored waters so as to interfere as little as possible with the bathing beaches on the shores of said lake, and will also use said waters in the fall so as to interfere as little as possible with navigation and logging uses of said waters, and will at all times so use said waters in as accommodating a way as possible, so as not to interfere more than is absolutely necessary with the natural fluctuation of said waters, that is, any more than is necessary to carry out the intents and purposes of the party of the second part under its said permit, No. 14689 and R 216.

In witness whereof, the respective parties, through their duly authorized officers, have hereunto affixed their corporate names on the day and year in this agreement first above written.

Payette Lakes Protective Association,
By Paris Martin, Its President.
Attest: Bradley Sheppard
Its Secretary
Party of the First Part.
Lake Reservoir Company·
By W. A. Coughanour,
Its President.
Attest: E. C. S. Brainard,
Its Secretary."

four feet in height above the normal high water line thereby causing the water of said Big Payette Lake to raise, back up and flow over and upon the said beaches and bathing beaches on the shores of said lake and thereby submerge, injure and destroy the same; and (e) has failed to use said waters in an as accommodating way as possible, but, on the contrary, has interferred more than necessary with the natural fluctuation of said waters and in the use thereof, in that during the months of June, July and August, the defendant did, by means of dams and head-gates so obstruct the natural flow of the water of said Big Payette Lake as to interfere with the natural fluctuation of said water and in the use thereof and has caused the bathing beaches and lands on the shores of Big Payette Lake to be overflowed and thereby injured and destroyed trees, banks, buildings and foundations, as well as the lands on the shores of said Big Payette Lake, all to the irreparable damage and injury of the plaintiff herein and its members; * * *."

Appellant demurred on the grounds the complaint failed to state a cause of action, respondent lacks legal capacity to sue, is not the real party in interest; uncertainty, ambiguity and unintelligibility in not alleging what the normal high and low water lines were; whose rights respondent sought to protect, or to what extent appellant had used the waters of the Lake above and below the normal high and low water lines; and moved to strike the portions of the amended complaint referring to respondent's constituent members as sham, irrelevant, immaterial and mere conclusions.

The complaint alleged respondent was a legally organized corporation and disclosed no disability of any kind. It, therefore, has complete statutory and recognized capacity to sue or be sued. Section 29-114, I.C.A.; American Home Benefit Ass'n v. United American Benefit Ass'n, 63 Idaho 754, at page 756, 125 P.2d 1010.

Of course, a party may have legal capacity to sue and not be a real party in interest. Generally a party to a contract not having parted with its interest therein may sue to enforce or prevent a violation thereof. 17 C.J.S., contracts, § 518; 39 Am.Juris. p. 876, Sec. 20.

Evidently appellant considered respondent had sufficient interest in the subject matter of the contract: namely, the extent of appellant's use of the Lake as a reservoir to cause appellant to enter into the contract with it. In any event appellant did contract with respondent, limiting appellant's use of the Lake as a reservoir and it would, therefore, seem to follow logically that appellant must recognize respondent's right to enforce the contract; otherwise, the contract would be without vital force.

"If in a particular transaction or course of dealing the authority, capacity, character, or status of one of the parties is recognized

or asserted as one of the basic facts on which the transaction proceeds, both parties are, as a rule, estopped to deny that the one occupied that position or sustained that character. * * *." 31 C.J.S., Estoppel, § 123; In re Schofield's Estate, 101 Colo. 443, 73 P.2d 1381, at page 1383; Jackson v. United Gas Public Service Co., 196 La. 1, 198 So. 633, at page 640.

"One who deals with an association as a legal entity capable of transacting business, and in consequence receives from it money or other thing of value, is estopped from denying the legality of its existence *or its right to contract.*" (Emphasis ours.) Petty v. Brunswick & W. Ry. Co., 109 Ga. 666, 35 S.E. 82, at page 83; 31 C.J.S., Estoppel, § 123; General American Oil Co. v. Wagoner Oil & Gas Co., 118 Okl. 183, 247 P. 99, at page 102.

"* * * It is well settled that one who deals with an association as a legal entity capable of transacting business, and in consequence receives money or other thing of value, is estopped from denying its right to contract." State Farm Mut. Automobile Ins. Co. v. Mackechnie, 8 Cir., 114 F.2d 728, at page 735; City of Jefferson v. Holder, 195 Ga. 346, 24 S.E.2d 187, at page 192.

One of the general public, without other interest, and though not a party to a restrictive contract, has been recognized as a real party in interest under somewhat similar situations. Davenport v. Buffington, 8 Cir., 97 F. 234, 46 L.R.A. 377; Goodman v. Powell, 210 Ark. 963, 198 S.W.2d 199, at page 201. See Stevens Hotel Co. v. Chicago Yacht Club, 339 Ill. 463, 171 N.E. 550.

■ A corporation is a person with the ordinary rights of a person. In re Case, 20 Idaho 128, at page 132, 116 P. 1037; Crom v. Frahm, 33 Idaho 314, at page 318, 193 P. 1013.

■ Respondent, drawing to and uniting in it the respective interests of littoral owners and others, is certainly as cognizable as a real party in interest as one suing for the benefit of others in a class suit under Section 5-316, I.C.A.; Hansberry v. Lee, 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22, at page 27, 132 A.L.R. 741. Though this is not a class suit, respondent's complaint alleging facts showing that it represents as a corporate entity its own rights and rights of its constituent members, is a real party in interest. Moffat Tunnel League v. United States, 289 U.S. 113, 53 S.Ct. 543, 77 L.Ed. 1069, 1070, at page 1073.

Respondent is accordingly justifiably recognized as a real party in interest. People v. Slocum, 1 Idaho 62; People v. Bugbee, 1 Idaho 88, 89.

■ The matters sought to be eliminated by the motion to strike were germane and tended to meet and overcome appellant's criticism of the complaint, hence were properly retained as not sham or frivolous.

■ Where the normal high water line was and the violations or extent of the violations of the contract in raising the water above such line, were matters of evidence

and the amended complaint sufficiently alleged the necessary pertinent, ultimate facts. Deffenbaugh v. Washington Water Power Co., 24 Idaho 514, 135 P. 247; Petajaniemi v. Washington Water Power Co., 22 Idaho 20, 124 P. 783.

The demurrer was properly overruled.

Appellant's answer as material, in substance denies it has raised or lowered the water above the high or low water lines or has so unseasonably retained the water as to damage respondent; that the contract is void in that it attempts to deny or limit appellant's right to appropriate and use public waters of this State and that respondent has no right, title and interest in any land facing the shore line of the Lake as owner, lessee or otherwise, and that appellant has acquired a prescriptive right to store the full amount of its 50,000 acre feet. The chief contentions are over the normal high water line and unseasonable holding of the water.

The parties having reached agreement and entered in to the contract set forth and sued upon, are estopped to deny its general nature and force and effect, and must act in accordance with such agreement and understanding. Saunders v. Robison, 14 Idaho 770, 95 P. 1057. Restrictive agreements of this nature are legal.

"At the outset, it should be noted that agreements containing restrictions as to the use of property include a great variety of subjects. Such contracts relating to dwellings and the cost and type thereof, a variety of business purposes, manufacturing, the sale of intoxicating beverages, and amusement purposes, are just a few of the many that the law has consistently recognized as valid. And necessarily so, for the Constitution guarantees the right to contract freely for lawful purposes. Equitable principles apply to all of such contracts alike, regardless of the subject of the contract. The equities of the parties alone are involved; the judgment affects them only, hence, any effort to include in the controversy the indirect consequences as to others contemplates a false issue." Stone v. Jones, 66 Cal.App.2d 264, 152 P.2d 19, at page 22; O'Neil v. Vose, 193 Okl. 451, 145 P.2d 411.

The flooding being periodical and only seasonally obnoxious to the contract, the statute of limitations has not run and appellant has not acquired any prescriptive rights contrary to the contract. Deffenbaugh v. Washington Water Power Co., supra; Lavin v. Panhandle Lumber Co., Ltd., 51 Idaho 1, 1 P.2d 186; Johnson v. Twin Falls Canal Co., 66 Idaho 660, 167 P.2d 834.

Appellant argues the contract is ultra vires and void as against public policy and that respondent by the contract has deprived appellant of its constitutional rights of appropriation. The statute providing for a hearing on the appropriator's application to make final proof envisions protests may be filed and such has been the practice and custom. Idaho Power & Transp. Co. v.

Stephenson, 16 Idaho 418, at pages 424, 425, 101 P. 821; Speer v. Stephenson, 16 Idaho 707, at page 718, 102 P. 365; Sarret v. Hunter, 32 Idaho 536, at page 541, 185 P. 1072; Idaho Power Co. v. City of Buhl, 62 Idaho 351, 111 P.2d 1088; Woodruff v. Butte & Market Lake Canal Co., 64 Idaho 735, 137 P.2d 325; Tanner v. Bacon, 103 Utah 494, 136 P.2d 957.

Forbearance by the withdrawal of respondent's protest was a good and valid consideration for the contract. Bank of America Nat. Trust & Savings Ass'n v. Stotsky, 194 Wash. 246, 77 P.2d 990, 991, at page 996.

Appellant having voluntarily entered into the contract whereby it agreed to limit the extent of its use of the Lake for storage purposes, we are called upon to determine only whether respondent, as the other party to the contract, has the right to enforce it.

We are not called upon to and do not, pass upon the right of such corporation absent such contract as herein, or any one not a littoral owner, to sue to restrain one having a storage right in the Lake from raising or holding the water beyond either the normal high water line or natural highest water line or below the low water lines, or to hold the water during periods beyond the natural and periodic flood stages.

 Appellant's cited authorities[2] do not hold directly or in general, a voluntary contract of this nature restricting the use of real property (which includes water rights) is invalid, void, ultra vires, or otherwise ineffective. While appellant asserts respondent is attempting to interfere with its constitutional right of appropriation of water, the right asserted by respondent is based upon the contract by which appellant itself limited its use of the Lake, and no reason has been advanced why there is any greater property right in water than in any other right of possession or use of property, real or personal, or the right to contract. 16 C.J.S., Constitutional Law, § 210; 11 Am.Juris., p. 1153, Section 339. Article 1, Section 1, Idaho Constitution is as omnipotent as Article 15, Section 3. State v. Horn, 27 Idaho 782, at page 787, 152 P. 275. The legislative policy relative to this Lake, though expressed subsequent to the contract, supports respondent's attitude rather than appellant's.[3]

---

[2] "Farmers' Co-operative Ditch Co. v. Riverside Irr. Dist., 16 Idaho 525, 102 P. 481; Sanborn v. Pentland, 35 Idaho 639, 208 P. 401; State Water Conservation Board v. Enking, 56 Idaho 722, 58 P.2d 779; Knutson v. Huggins, 62 Idaho 662, 668, 115 P.2d 421; Voise-Payette Lumber Co. v. Challis Independent School Dist., 46 Idaho 403, 268 P. 26; * * * People v. Burke, 72 Colo. 486, 212 P. 837, 30 A.L.R. 1085." 50 Restatement, Contracts, p. 671, Sec. 369, is not in point.

[3] "Section 1. The Governor is hereby authorized and directed to appropriate in trust for the people of the State of Idaho all the unappropriated water of Big Payette Lake, or so much thereof as may be necessary to preserve said lake in its present condition. The preservation of said water in said lake for scenic beauty, health and recreation purposes necessary and desirable for all the inhabitants of the State is hereby declared to be a beneficial use of such water.

Respondent having fully performed by withdrawing its protest and appellant having accepted the fruits thereof: namely, relief from the hazard of not obtaining approval, and having secured approval of its application without the necessity of a hearing, it would appear it would be estopped to set up any claim of ultra vires or invalidity of the contract.

"It is claimed by appellants, * * * was ultra vires and void. Without passing upon this question, it is sufficient to say that the defendants were competent parties, and, having received the benefits of the contract, they are now estopped from setting up the defense of ultra vires. This rule is so well established, and is consonant with every principle of equity and common honesty, that it needs no citation of authority to support it." Fremont County v. Warner, 7 Idaho 367, at page 370, 63 P. 106, 107.

"It is also well settled that a corporation cannot avail itself of the defense of ultra vires when the contract has been in good faith fully performed by the other party and the corporation has had the full benefit of the performance of the contract." First Nat. Bank v. Callahan Mining Co., 28 Idaho 627, at page 641, 155 P. 673, 677; Power County v. Evans Bros. Land & Live Stock Co., 43 Idaho 158, at page 166, 252 P. 182; Emmett Irrigation Dist. v. Thompson 9 Cir., 253 F. 316.

Appellant's proffered Exhibit M was a copy of a decree entered August 29, 1944, in a suit between appellant and the State Board of Land Commissioners and State Reclamation Engineer, purporting in said suit to determine that 8.2 feet was approximately the Lake's natural high water level. The authorities cited by appellant to sustain the admissibility of this Exhibit and similar decisions, hold merely that a judgment is not binding on any one not a party or in privity to the proceeding. Lambrix v. Frazier, 31 Idaho 382, 171 P. 1134; Neil v. Hyde, 32 Idaho 576, 186 P. 710; Mays v. District Court, 34 Idaho 200, 200

"No fee shall be required in connection with said appropriation by the Governor or the permit issued in connection therewith, and no proof of completion of any works of diversion shall be required, but license shall issue at any time upon proof of beneficial use to which said waters are now devoted.

"Each succeeding Governor in office shall be deemed to be a holder of such permit, in trust for the people of the State.

"Sec. 2. The lands belonging to the State of Idaho between high and low water mark at said Big Payette Lake, as well as all other lands of the State adjacent to said lake, until the same are disposed of by the State Board of Land Commissioners, are hereby declared to be devoted to a public use in connection with the preservation of said lake in its present condition as a health resort and recreation place for the inhabitants of the State and said public use is hereby declared to be a more necessary use than the use of said lands as a storage reservoir for irrigation or power purposes.

"Sec. 3. If any part of this act shall be adjudged to be invalid, such judgment shall not affect, impair or invalidate any part of the remainder." Chapter 83, 1925 Session Laws, p. 117.

P. 115; Collard v. Universal Automobile Ins. Co., 55 Idaho 560, 45 P.2d 288; Ada County v. Bottolfsen, 61 Idaho 64, 97 P.2d 599; Carrington v. Crandall, 65 Idaho 525, 147 P.2d 1009; Reynolds Irr. Dist. v. Sproat, 65 Idaho 617, at page 621, 151 P.2d 773; Hansberry v. Lee, supra.

■ Such decisions do not hint judgments are nevertheless admissible against non-parties and it has been held the lack of force of a judgment against a non-party excludes it as evidence against such non-party, Chadima v. Kovar, 168 Iowa 385, 150 N.W. 691, at pages 692, 693. While under some circumstances, judgments are admissible for limited purposes against non-parties, see IV Jones' Commentaries on Evidence, 2d Ed. 1926, p. 3367, Par. 1815, we have found no case sustaining admissibility as applicable here and the general rule is to the contrary. Town of Cloverdale v. Smith, 128 Cal. 230, 60 P. 851; Reusens v. Cassell, 100 Va. 143, 40 S.E. 616; Ferrie v. Sperry, 85 Conn. 337, 82 A. 577, at page 578; Tanner v. Bacon supra; Emmil v. Smith, 62 N.D. 174, 242 N.W. 407; United Fuel Gas Co. v. Hays Oil & Gas Co., 111 W.Va. 596, 163 S.E. 443, at page 445; Fitchette v. Sumter Hardwood Co., 145 S.C. 53, 142 S.E. 828, at page 833.

■ The relevancy of estoppel arising by reason of the answer, respondent did not have to plead it. Powell-Sanders Co. v. Carssow, 28 Idaho 201, at page 213, 152 P. 1067; 120 A.L.R., p. 11 note, 177 note, 103 note; Hillcrest Irr. Dist. v. Nampa & Meridian Irr. Dist., 57 Idaho 403, at page 411, 66 P.2d 115.

The remaining issues are of fact: first, what the normal high and low water lines were in 1924; and, second, whether appellant has violated the contract by raising or lowering the water beyond the same and in such a manner as to violate the other provisions of the contract with regard to withdrawing the water in such a way as to interfere as little as possible with the normal shore line and activities which may be engaged in thereon and relative thereto.

Appellant in its brief states:

"When the parties referred in said agreement to 'the normal high water line', they were using language in the present tense—an existing high water line—something with which they were all familiar, and they made reference to this existing line above which appellant was not to hold the water. * * *

"To all these people the 'normal high water line' or the 'high water line' was a known, visible, and easily recognized line around the lake, at which elevation the water had stood for a sufficient length of time to make a definite water line or mark." and quotes from the case of Raide v. Dollar, 34 Idaho 682, 203 P. 469, 472:

"By the term 'high-water mark' is meant those points along the shore where water rises to such height as may reasonably be anticipated, but it does not include such extraordinary freshets as cannot be anticipated." (Citing cases).

Also quoting from Carpenter et al. v. Board of Commissioners, 56 Minn. 513, 58 N.W. 295, 297, 45 Am.St.Rep. 494: " 'High-water mark' means what its language imports,—a water mark. * * * It is the point up to which the presence and action of the water is so continuous as to destroy the value of the land for agricultural purposes by preventing the growth of vegetation, * * *."
and further states:

"It is a law of nature that water in a lake will make a high water mark or line and it was this high water line made by the action of water which then existed that the parties were referring to in their agreement.

"If this is not the correct interpretation of the agreement, then how could a high water line or mark ever be determined after 1924, the year the agreement was made. The parties all knew that thereafter the elevation of the water would be artificially controlled by this dam. * * *"

Parenthetically it may be observed at this point that giving effect to such restriction on the applicable evidence confines consideration to "normal high water line" and eliminates consideration of the measurements and evidence pertaining to the high water line after 1924, except as such evidence shows the high water line after 1924 was the same as that before.

Respondent states in its brief: "There is no conflict between appellant and respondent that the normal high water line is the washed shore line where vegetation ceases to grow, or is stabilized, and below which vegetation is wrested from the soil; and in the case at bar the line where the lake, plus the wave action, had pushed back the vegetation and had washed a line, which was the normal high-water line at the time of the execution of the agreement and prior to any obstacles or impediments being placed in the lake by appellant."

The term used in the contract, however, was not "high water line", but *"normal high water line"*. (Emphasis ours.) "Normal" has been defined as follows:

"The average or mean of observed quantities. The usual state or condition." Oxford Dictionary, p. 207, Vol. VI.

"* * * regular or natural, * * *." Funk & Wagnalls New Standard Dictionary, p. 1686.

"The ordinary or usual condition, degree, quantity, or the like; average; mean." Second Edition, Webster's New International Dictionary, p. 1665.

The use of the word normal may not be ignored and applying it to the word "high", we must conclude the contract did not mean the highest level to which water naturally raised prior to 1924 for a sufficient length of time to make a mark, but the normal or average height the water reached at the highest stages during the years. The evidence merely as to the highest line the water may have reached, did not thus establish the "normal high line".

Flisrand v. Madson, 35 S.D. 457, 152 N.W. 796.

"* * * The term 'low-water mark,' used in the statute, means ordinary low water, not spring tide or neap tide, but normal, natural, usual, customary, or ordinary low water, uninfluenced by special seasons, winds, or other circumstances. In this sense, there was the greatest abundance of evidence to support the verdict." Scott v. Doughty, 124 Va. 358, 97 S.E. 802, at page 804. Appeal of York Haven Water & Power Co., 212 Pa. 622, 62 A. 97; Kentucky Lumber Company v. King, Ky., 65 S.W. 156.

"* * * It would seem to be reasonable that high and low water marks should be ascertained by the same rule. The place to which tides ordinarily flow at high water becomes thereby a well-defined line or mark, which at all times can be ascertained without difficulty. If the title of the owner of the adjoining land were to be regarded as extending, without the aid of the ordinance, to the place to which the lowest neap tides flowed, there would be found no certain mark or boundary by which its extent could be determined. The result would be the same if his title were to be limited to the place to which the highest spring tides might be found to flow. It is still necessary to ascertain his boundary at high-water mark in all those places where the tide ebbs and flows more than one hundred rods for the purpose of ascertaining the extent of his title towards low-water mark. It is only by considering the ordinance as having reference to the ordinary high and low water marks that a line of boundary at low-water mark becomes known, which can be satisfactorily proved, and which, having been once ascertained, will remain permanently established." McBurney v. Young, 67 Vt. 574, 32 A. 492, 29 L.R.A. 539. Slauson v. Goodrich Transp. Co., 94 Wis. 642, 69 N.W. 990; Stover v. Jack, 60 Pa. 339, 100 Am.Dec. 566.

"The high-water mark on fresh water rivers is not the highest point to which the stream rises in times of freshets, but is 'the line which the river impresses upon the soil by covering it for sufficient periods to deprive it of vegetation and to destroy its value for agriculture.'" Tilden v. Smith, 94 Fla. 502, 113 So. 708, at page 712.

These quotations are pertinent, both as to how the normal is to be determined and as affirmative of the trial court's determination herein.

Defendant's Exhibit H portrayed herein shows a high-water band upon the rocks at the first house south of the mouth of Dead Horse Creek on the western side of the Lake at about the center of the south half of Section 15, Township 19 North, Range 3 East, B. M. The pertinency of this high-water band as determining the water line depends upon when it was made and the record does not disclose it was made prior to 1924. The picture was taken October 24, 1944, and the top of the band was at that time 8.30 or 8.35 feet above zero on the gauge and the water was 1.47 above zero; thus, between the edge of the water

and the top of the band was 6.88 feet. Scaling the original Exhibit, shows the top of the line is 9/16 of an inch above the water line and the band itself is 1/16 inch wide, or .76 feet. The normal line, therefore, as shown by the band would be somewhere between 7.69 and 8.35 . ft. The figured proportions would obtain, regardless of the size of the reproduction.

1939 and 1941. No gauge height has been shown in the record to a height of 8.35, or the top of this band in the picture, prior to 1935. Therefore, if this band mark as it now exists and as shown in the picture was first made by the water at that level in 1935, 1939 and 1941, it would not be controlling as to 1924. From the record, therefore, it cannot be said that the mark

Defendant's Exhibit H.

Plaintiff's Exhibit 70 shows the gauge heights as recorded between 1921 and 1945, inclusive, and shows the water was held above 7.69 in 1928, 1929, 1930, and continuously thereafter from 1933 to 1945. It was held to or above 8.35 in 1935,

or band is immutably established as existing in 1924.

To establish the normal high water mark in 1924, both parties produced lay witnesses who testified as to their residence or owner-

ship of property on the Lake shore and the places where the water lines were in 1924 prior and subsequent to the erection of appellant's dam; the first one having been completed in 1926, washed out in 1943 and replaced shortly thereafter; official and unofficial water readings and gauge heights, somewhat fragmentary prior to 1924; various photographs of the shore line, some taken as early as 1912 and compared by the persons taking them with pictures taken later in relatively the same place or places; the opinions of expert and well-qualified engineers, both from personal observation and interpretation of the gauge readings, etc., varying from an estimate of 6.4 by Mr. Smith in 1923–24, to estimates of 8.2 as of 1933 and 1943 by Mr. Tucker; of 8.35 in 1944 by Mr. Harmon; of 8.2 as of 1944 by Mark Kulp; and 8.55 in 1938 and 1943 by Mr. Spofford.

A meander corner on the east and west line between Sections 28 and 33, Tp. 19 N., Range 3 East, B. M., east of the corner common to Sections 28, 29, 32 and 33, was first established by Mr. Kimmel in 1894; relocated in 1923 by Mr. Forshay and Mr. Bush; in 1932–33 by Mr. Tucker, and again relocated by Mr. Scharf in 1942. These men were all engineers of note. There was evidence that an iron bolt was set on this meander corner by Mr. Bush in August, 1923. While undoubtedly the height of this bolt may have been changed, the lateral placement was definitely located and re-located, so evidence with regard to the geographical or longitudinal location of this bolt was sufficiently accurate to justify the trial court and us in concluding there was a definite point where it was placed and that this identical spot was and is capable of ascertainment. The testimony of Mr. Bush, who set the bolt, was that at the time it was set the shore line was on the Lake side of the bolt. There is also competent evidence to show at that time the normal high water line was not above this corner, and there is evidence that since 1924 the shore line has advanced higher and away from the Lake side of the bolt; i. e. to the southwest. There is likewise evidence to the contrary. Appellant introduced evidence with relation to high water flooding the floor of a sawmill in 1915 which was located at the southern end of the Lake and the height of the original floor and as subsequently raised with reference to the sea level gauge, was accurately given. Such evidence merely shows high water, not that such was the normal high water and at most merely raises a conflict in the evidence.

Plaintiff's Exhibit 35 was a tabulation prepared by Mr. Mark Kulp, Commissioner of Reclamation and an eminent engineer, from records made and secured from other State or Federal officers and shows the following gauge heights for years prior to 1924:

| | |
|------|------|
| 1922 | 6.60 |
| 1923 | 6.35 |
| 1924 | 7.60 |
| 1925 | 7.45 |

It is not clear whether the maximum of the gauge height in 1924–25 was before or after the water was raised by flash boards being placed at the dam. At any rate, the average of these four years is 7.0 feet.

Plaintiff's Exhibit 70 is a tabulation of gauge heights prepared by Gordon Smith, an experienced engineer, from official records covering the years 1921 to 1945. The pertinent readings are:

| | |
|------|------|
| 1921 | 4.66 |
| 1922 | 6.53 |
| 1923 | 6.28 |
| 1924 | 7.53 |
| 1925 | 7.38 |

or an average of 6.476 feet. The rest of the tables show that the high water line has been consistently and increasingly raised since 1925, the highest being in 1935 (8.75) due to excessively high water and asserted inability to get the flash boards out in time, and over 8 feet for 13 years between 1929 and 1945.

Mr. Charles W. Luck, deceased, who owned land on the eastern arm of the Lake and was himself a Civil Engineer, took gauge readings which were introduced by his daughter, in whose possession they were, as Defendant's Exhibit C-1, which shows:

| | |
|------|------|
| 1908 | 5.02 |
| 1909 | 8.47 |
| 1911 | 8.57 (the higher of two readings for that year) |
| 1912 | 8.44 |
| 1920 | 7.44 |
| 1924 | 7.44 |

or an average of 7.563. The zero of the standard gauge is 4989.86 feet. These gauge heights made by Mr. Luck have to be adjusted because the zero used by him fluctuated. In 1908 it was 4987.26. To make it comparable to heights from the correct zero, we have to subtract or add to the gauge readings as follows:

| | Correct | Luck's | | | | | |
|------|---------|---------|---|-----|---|------|---|------|
| 1908 | 4989.86 | 4987.26 = | −2.60 | plus | 5.02 | equals | 2.42 |
| 1909 | " | 4990.71 = | .85 | " | 8.47 | " | 9.32 |
| 1911 | " | 4990.81 = | .95 | " | 8.57 | " | 9.52 |
| 1912 | " | 4990.68 = | .82 | " | 8.44 | " | 9.26 |
| 1920 | " | 4989.68 = | − .18 | " | 7.44 | " | 7.26 |
| 1924 | " | 4989.68 = | − .18 | " | 7.44 | " | 7.26 |

or the correct average of 7.506 feet.

The tables in Surface Water Supply of the United States, a publication of the Department of the Interior, showed the maximum gauge heights as follows:

p. 238, 1921 — June 12, 6.84 ft.
p. 241, 1922 — June 2, 5.85 "
p. 205, 1923 — June 5, 4.57 "
p. 203, 1924 — May 18, 5.63 "
p. 210, 1925 — May 30, 5.94 "

or an average of 5.766 feet.

The record does not indicate how long water must stand at a certain level to retard or destroy upland vegetation, nor exact effects of wave or current action as undermining and eroding banks and shore lines above the level of the water when in repose; though all such were adverted to by various witnesses.

There was evidence of trees falling because their roots were undermined and the supporting shore washed away; the necessity of building retaining walls of logs and stone and their required replacement because of the water at high levels destroying them. True, there was likewise evidence of logs remaining in place over the years, as though undisturbed by the higher waters.

The evidence is voluminous and the above references, though sketchy and not all-embracing, are sufficiently illustrative, and sustain the finding of the trial court that the normal high water line in 1924 was 7.05 and the normal low 1.51 on the present gauge. There was likewise competent evidence that since 1924 the level of the water in the Lake has been consistently increased and raised to heights generally ranging above eight feet on the gauge and particularly during July, which with August, is the main recreational season when the water thus raised is most injurious to respondent and owners around the Lake, flooding the beaches and eroding the shores, contrary to the contract. The trial court meticulously examined such records as there were and disclosed by his memorandum opinion that he carefully considered all the pertinent facts and circumstances pertaining to the water lines. Under a well-known rule, therefore, the judgment of the trier of facts must be sustained.

Respondent having fully performed by withdrawing the protest, there is no lack of mutuality. Q. R. S. Company v. Phillips-Jones Corp., 194 App. Div. 170, 185 N.Y.S. 127; Surface Creek Ditch & Reservoir Co. v. Grand Mesa Resort Co., 114 Colo. 543, 168 P.2d 906; Ferry-Leary Land Co. v. Holt & Jeffery, 53 Wash. 584, 102 P. 445; Linn County v. Calapooia Lumber Co., 61 Or. 98, 121 P. 4; Barker v. Mintz, 73 Colo. 262, 215 P. 534, and 28 Am.Juris. pp. 220, 221, Pars. 28 and 29, did not involve injunctive relief on contracts. 28 Am.Juris. p. 280, Par. 88, is the pertinent text as to injunctive enforcement of restrictive contract covenants.

By reason of the contract, respondent, though not thereby a grantor, would seem in principle to have rights, with regard to enjoining the violation of a contract,

similar to that of a grantor to enforce restrictive covenants as to the use of transferred property. See Pomeroy's Equity Juris., 4th Ed., Pars. 1295, 1296, p. 3120. Injunction is, therefore, a proper remedy and available to respondent. Crawford v. Senosky, 128 Or. 229, 274 P. 306; Guild v. Wallis, 130 Or. 148, 279 P. 546; Johnson v. Twin Falls Canal Co., 66 Idaho 660, 167 P.2d 834. See Pomeroy's Equity Juris., 4th Ed., Section 1342, p. 3215.

▮▮ It is a well defined exception to a general rule heretofore considered that, where one who has entered into a restrictive covenant as to the use of land commits a distinct breach thereof, he will be enjoined irrespective of the amount of damage caused by his breach, and even if there appears to be no particular damage. A court of equity fastens upon the real contract and compels the execution of the very thing covenanted to be done. The mere circumstance of the breach of covenant affords sufficient ground for a court to interfere by injunction. It is not necessary to prove that the injury will be irreparable. It has even been held that the right to an injunction will in no way be affected by the fact that the act complained of would be beneficial to complainant's property. Plaintiff may stand on the very letter of his obligation, for a party may not make a solemn engagement and then disregard it on the ground that no harm will result." 32 C.J., p. 208, § 324; 43 C.J.S., Injunctions, § 87c.

▮ Appellant's limited use of the Lake as a reservoir was the very essence of the contract and the results of compliance are not so unreasonable as to be inequitable. Hill v. Standard Min. Co., 12 Idaho 223, 85 P. 907; Deffenbaugh v. Washington Water Power Co., supra; Lavin v. Panhandle Lumber Co., Ltd., supra; Fairchild v. Raines, 24 Cal.2d 818, 151 P.2d 260; Surface Creek Ditch & R. Co. v. Grand Mesa Resort Co., supra; Meriwether Sand & Gravel Co. v. State, 181 Ark. 216, 26 S. W.2d 57.

▮ The provisions of the decree providing for its enforcement by the installation of proper gauges and the keeping of records, and the level of the Lake within the contract limits[4] are a proper exercise of the equity powers of the court. Taylor v. Hulett, 15 Idaho 265, at page 272, 97 P. 37, 19 L.R.A.,N.S., 535; Silkey v. Tiegs, 51 Idaho 344, at page 358, 5 P.2d 1049.

▮ We have not overlooked the evidence relative to appellant's use of water from the Deadwood reservoir and necessary acquisition of substitutional water from the

---

4 " * * * and that said defendant shall install and maintain suitable and efficient markers and devices at the outlet of said lake and at suitable points on the shores of said lake so as at all times to automatically and accurately measure and register the elevation of the waters of said lake at all stages of storage and withdrawal of water, and the waters drawn or diverted from said lake; all such measuring devices and gauges, together with the premises where the same are situated, shall at all times be subject to access and inspection of either party hereto and to public officials and watermasters having jurisdiction over the storage, retarding, withdrawing and diverting of any of the waters of Big Payette Lake."

Cascade reservoir. Neither justifies violation of the contract nor impairs our conclusions.

Appellant has established no legal reason why it should not be held to its contract, which it freely and voluntarily entered into, restricting its use of Payette Lake as a reservoir for the storing of water as to amount, season, and method of withdrawal.

Judgment is, therefore, affirmed. Costs awarded to respondent.

HOLDEN and HYATT, JJ., and SUTPHEN and PORTER, District Judges, concur.